*In re* QUEJAS presentadas contra el SECRETARIO DE JUSTICIA, LIC. HÉCTOR RIVERA CRUZ.

*Números:* AB-85-21 *Resueltos:* 11 de mayo de 1987
AB-85-23

---

830

*Carlos Romero Barceló*, abogado querellante; *Héctor Rivera Cruz, pro se.*

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

A modo de prólogo, repetimos que las "fronteras y aplicación tajante de algunos cánones de ética a veces resultan complicadas. La ausencia de precedentes en unión a hechos de su faz inocentes, dificultan en ocasiones la expresión nítida de la pauta a regir. Sin embargo, ello no es óbice para cumplir con nuestra función constitucional de orientar en este campo a la profesión togada. *In re Díaz Alonso, Jr.*, 115 D.P.R. 755 (1984)". *In re Carreras Rovira y Suárez Zayas*, 115 D.P.R. 778, 783–784 (1984).

I

El 20 de julio de 1982, Olga Iris Mateo, en unión a otros superintendentes escolares del Departamento de Instrucción Pública, presentaron ante el Tribunal Superior, Sala de San

Juan, el caso Civil Núm. PE-82-970, [1] sobre sentencia declaratoria, solicitud de *injunction* permanente y daños contra el Estado Libre Asociado y el Departamento de Instrucción. El Lic. Carlos Romero Barceló entonces Gobernador de Puerto Rico, la Secretaria de Instrucción, Dra. María Socorro Lacot, el Sr. Carlos Chardón y varios Gerentes Escolares también fueron demandados, tanto en su carácter oficial como personal. [2] En síntesis, adujeron violación a sus derechos constitucionales e infracción a la Ley de Personal y Reglamentos, pertinentes en la creación, clasificación y remuneración de puestos fijos de *Gerentes Escolares* (Director Ejecutivo II), dentro del servicio docente del Departamento de Instrucción. Alegaron que dicho puesto era ilegal y fue concebido con el "propósito de conceder a los miembros del Partido Nuevo Progresista y/o a los que tienen el visto bueno del mismo, empleos dentro del Departamento de Instrucción Pública a espaldas de lo dispuesto en la ley ...".

En virtud de la Ley Núm. 9 de 26 de noviembre de 1975, según enmendada, 32 L.P.R.A. sec. 3085 *et seq.*, sobre representación legal prestada por el Estado a funcionarios públicos, algunos de los demandados solicitaron del Secretario de Justicia, Lic. Héctor Reichard, que se les proveyera esa asistencia, y de resultar responsables, se asumiera el pago de cualquier indemnización. Dicho funcionario accedió a la representación legal e hizo extensivo ese beneficio [3] a todos, incluyendo al

---

[1] Tomamos conocimiento judicial de los autos, documentos y trámites habidos en el mismo.

[2] Marcelino Burgos Pabón, Rafael Ortiz Rodríguez, Eneida Colón, José M. Carrasquillo, y otros innominados. Posteriormente intervinieron otros superintendentes escolares y, mediante enmiendas, se adicionaron como demandados: Julio Betancourt, Marcelino Burgos, María Santos de Arroyo, Olga Rosado Torres, Lucía Rosario, Norma I. Matos, Leocadio Alejandro, Lillian Cepero, Francisco Vázquez, José C. Martí, Mercedes Dávila Torres y María Encarnación.

[3] Debe tenerse presente que el beneficio original es la representación legal. El pago "de la totalidad de la sentencia" no es automático. Lo deci-

Gobernador, Lic. Carlos Romero Barceló. (⁴) A tales fines el Departamento de Justicia designó y contrató al Lic. Héctor Urgell Cuebas.

Así representados, los demandados contestaron la demanda el 7 de diciembre de 1982. Negaron las alegaciones y en contrario, afirmaron estar facultados en ley y haber cumplido con una obligación ministerial "velando los mejores intereses públicos, particularmente los de la educación en nuestras instituciones públicas de enseñanza".

Subsiguientemente acaecieron innumerables incidentes usuales en este tipo de procedimiento. Transcurrió el tiempo. Pasadas las elecciones, advino una nueva administración el 2 de enero de 1985. El Lic. Héctor Rivera Cruz fue designado y

---

dirá el Secretario de Justicia *"posteriormente,* considerando los hechos que determine probados el tribunal". (Énfasis suplido.) 32 L.P.R.A. sec. 3087.

Esta dinámica operacional subsiste en las enmiendas introducidas por la Ley Núm. 113 de 10 de julio de 1986. Su Art. 14 dispone:

"El Secretario de Justicia determinará en qué casos el Estado Libre Asociado asumirá la representación legal y posteriormente, considerando los hechos que determine probados el tribunal *o que surjan de la prueba desfilada,* decidirá si procede el pago de la totalidad de la sentencia que le fuere impuesta a los funcionarios, ex funcionarios, empleados o ex empleados públicos demandados, de conformidad con lo que establecen los Artículos 12 al 19 de esta ley.

*"No obstante, si antes de actuar o dejar de hacerlo, el funcionario, ex funcionario, empleado o ex empleado solicitó una Opinión al respecto del Secretario de Justicia y su acción u omisión se realizó de acuerdo a los términos de la misma el Estado no podrá negar o retirar a dichas personas la representación legal ni negarse al pago total de la sentencia que les fuera impuesta."* (Énfasis suplido.) 1986 Leyes de Puerto Rico 369–370.

(⁴) En su comparecencia, el Secretario de Justicia señala que al cancelarse en ese caso el contrato de abogado externo al Departamento, la "representación de aquellos demandados que habían recibido los beneficios de la Ley Núm. 9, incluyendo al licenciado Romero Barceló que como mencionamos anteriormente *nunca cumplió con los requisitos de la ley para hacerse acreedor de sus beneficios* fue asumida por los abogados del Departamento de Justicia. En otros casos donde el licenciado Romero Barceló figuraba como demandado en los *que a juicio del Departamento podía existir un conflicto de intereses por vía de excepción se le permitió al licenciado Carlos Romero Barceló que seleccionara un abogado de su preferencia, que sería contratado por el Departamento de Justicia".* (Énfasis suplido.) Carta de 19 de diciembre de 1985, pág. 8.

juramentado como Secretario de Justicia. Según expone, en consideración al número sustancial de casos contratados por el Departamento de Justicia con abogados de la práctica privada, y al impacto fiscal que ello representaba, éste canceló *todos* los contratos. Además dispuso que los abogados de la División de Litigios del Departamento sustituyeran a los abogados privados en la representación legal de toda persona demandada que gozara de dicho beneficio. Según su comparecencia, "en algunos casos en los que *existía alguna posibilidad de conflicto con los intereses del Departamento*, al igual que en casos en los cuales el Departamento no tuviera los recursos necesarios para atenderlos adecuadamente, por vía de excepción, se determinó que se habrían de contratar los servicios de abogados externos". (Énfasis suplido.) Carta de 19 de diciembre de 1985, pág. 7. Como consecuencia, el contrato del licenciado Urgell Cuebas fue cancelado, pues el Departamento "entendi[ó] que no se justificaba". El 30 de enero de 1985, el licenciado Urgell Cuebas renunció su *representación* ante el tribunal. La asumió la División de Litigios. El 7 de febrero de 1985 compareció a informar un trámite acordado con los demandantes Mateo *et al.*, para simplificar las tomas de unas deposiciones.

El 11 de febrero de 1985, el licenciado Romero Barceló comunicó por escrito al Secretario de Justicia Héctor Rivera Cruz su preocupación de que no se le había notificado formalmente la cancelación de contratos profesionales de abogados privados que antes ostentaban su representación y cómo ello podría afectarle. Le expuso la posibilidad de que pudiera "haber diferencias de criterio entre la actual administración y el que suscribe", y su deseo de que el abogado a designarse fuera aprobado por él. Solicitó que le informara "todos y cada uno de los casos donde yo soy parte demandada y se ha cancelado el contrato de servicios profesionales. Intereso además que me deje saber qué acción ha tomado usted en relación con la representación profesional mía y si no ha tomado ninguna acción,

qué acción piensa tomar. Al darme la información agradeceré me indique el nombre del caso, el número del caso y el Tribunal ante el cual está radicado". (⁵) Anexo Núm. 2, pág. 16.

El 21 de febrero de 1985, el licenciado Romero Barceló le comunicó al Secretario de Justicia Héctor Rivera Cruz —a raíz de éste haber autorizado que le representara un abogado privado en el caso Civil Núm. 84-3028, *Carlos Gutiérrez Rodríguez* v. *Carlos Romero Barceló*— haber seleccionado al Lic. Amancio Arias Cestero. Al contestar esta carta, el 11 de marzo de 1985, el Secretario de Justicia le informó haber examinado ese "y los otros casos en que está usted recibiendo los beneficios de la Ley Número 9 de 26 de noviembre de 1975. Luego de este estudio, se ha tomado la determinación de que los abogados del Departamento continúen representándolo en todos los procedimientos que están pendientes en los que aparece usted como demandado.

"El pasado 7 de marzo de 1985 conversé con el Lcdo. Amancio Arias Cestero y le expliqué personalmente las razones que tenemos para tomar esta determinación. *En estos casos, aunque se le demanda a usted en su carácter personal, se hace nominalmente, ya que realmente es el Estado Libre Asociado el que está envuelto. Estamos seguros que las gestiones profesionales de nuestros abogados van a tener el resultado de que usted quede excluido, como demandado, en estos pleitos"*. (Énfasis suplido.) *Exhibit* I.

El 14 de marzo de 1985, el licenciado Romero Barceló acusó recibo de la anterior y expuso:

Conforme a su carta, se tomó esta determinación a base de que se me demanda a mí en mi carácter personal pero en *forma nominal* y que usted entiende que el resultado de las

---

(⁵) A modo de paréntesis, notamos que el Secretario no formuló contestación total a esta petición del licenciado Romero Barceló hasta el 31 de enero de *1986*, ocasión en que le desglosó los casos en que estaba demandado, relacionó el nombre del abogado del Departamento o privado que lo representaba, y le hizo un breve recuento del estado procesal de los mismos.

gestiones de los abogados del Departamento de Justicia será que yo quede excluido como demandado en estos pleitos.

Confío en que habrá de radicarse las mociones de desestimación o sentencia sumaria pertinentes para lograr el que yo quede excluido como demandado antes de que se comiencen las vistas de cualquiera de los casos. En relación con cualquier asunto relacionado con estos casos, le agradeceré le imparta instrucciones al abogado o abogados que estén atendiendo los mismos, que se comuniquen con el Lic. Amancio Arias Cestero. (Énfasis suplido.) Anexo Núm. 5, pág. 19.

Así las cosas, el 15 de marzo de 1985 el Secretario de Justicia efectuó varias determinaciones. Con referencia al caso Civil Núm. 84-0431, informó por escrito al licenciado Romero Barceló quiénes serían los abogados privados que representarían a ciertos codemandados en su carácter individual, y además consignó:

Como le indicamos en nuestra carta del 11 de marzo de 1985, aunque en éste y otros casos a usted se le demanda en su carácter personal, *se hace nominalmente, ya que realmente es el Estado Libre Asociado el que está envuelto.* El Departamento de Justicia está dispuesto a continuar ofreciéndole representación legal de conformidad con la Ley 9. Es a este Departamento, sin embargo, al que la ley confiere la potestad de escoger el abogado que representará al funcionario o ex-funcionario demandado en su carácter personal y que solicita los beneficios de la Ley 9. Vea 32 L.P.R.A. sec. 3090 ("Todo demandado cubierto por las disposiciones de las secs. 3085 a 3092 de este título, que solicite representación legal del Estado Libre Asociado, podrá ser representado en el pleito por abogados del Departamento de Justicia, o por abogados en la práctica privada, previa autorización del Secretario de Justicia").

Usted me ha reiterado su intención de que sea el Lic. Amancio Arias el que lo represente en la acción en su contra, en su carácter personal. Usted tiene perfecto derecho a escoger el recibir los beneficios de la Ley 9, y que sea el Departamento el que determine quién lo representará, o escoger usted a su abogado. *En ese último caso, sin embargo, usted asume todos los gastos de su representación legal, así como el*

*pago de cualquier sentencia que en su día recaiga e*?, *s*; *contra en su carácter personal.*

Aclarado este punto, y para poder cumplir con la Orden del Juez Gierbolini del 27 de febrero pasado, le pido que antes del martes 19 de marzo de 1985, a las 12:00 del mediodía me informe por escrito si desea usted continuar recibiendo los beneficios de la Ley 9 (en cuyo caso el Departamento de Justicia lo representará), o renuncia a dichos beneficios y decide así escoger a su propio abogado. De no recibir comunicación para la fecha y hora indicada, presumiré que se ha reafirmado en su decisión de escoger su propio abogado con las consecuencias arriba descritas. (Énfasis suplido.) [6] Anexo Núm. 6, pág. 20.

En igual fecha, 15 de marzo de 1985, el Secretario de Justicia —para atender una consulta de la actual Secretaria de Instrucción Pública, Sra. Awilda Aponte Roque, respecto a "su facultad para abolir los puestos de Gerente Escolar y los derechos de los empleados que [lo] ocupan" (*exhibit* 7) — emitió una extensa opinión escrita. Resolvió que el puesto de

---

[6] Fechada el 18 de marzo de 1985, el Lic. Carlos Romero Barceló contestó:

"Con fecha 15 de marzo de 1985 me envía usted una carta en la cual me concede hasta el 19 de marzo de 1985 a medio día para informarle si deseo continuar o no recibiendo los beneficios de la Ley 9.

"No solamente le informé, sino que le solicité formalmente el que se me extendieran los beneficios a la Ley 9, a la cual tengo derecho y que usted en ningún momento niega. Por el contrario, usted acepta mi derecho y me asigna abogados del Departamento cancelando el contrato previamente otorgado al Lic. Amancio Arias. Me ha indicado usted además que luego de examinados los casos, usted entiende que soy demandado en forma nominal y que yo quedaré excluido como demandado en estos pleitos por las gestiones que hagan los abogados del Departamento de Justicia.

"No tengo ningún inconveniente y le he aceptado que sean los abogados de Justicia quienes hagan las gestiones para que yo quede excluido de estos pleitos.

"Por la presente le reitero mi aceptación de que el Departamento de Justicia asuma mi representación y mi defensa en el caso.

"Sin embargo, quiero indicarle que esta aceptación no implica ninguna renuncia a exigir un abogado de mi confianza en caso de que surjan conflictos de intereses entre algún demandado ya representado por el Departamento de Justicia y yo." Anexo Núm. 7, pág. 22.

Gerente Escolar, tal como fue creado, clasificado e implantado, era ilegal y contrario a las leyes y reglamentos aplicables. Concluyó que procedía la separación de quienes lo ocupaban.

Paradójicamente ese mismo día, el Secretario de Justicia también suscribió la Carta Circular Núm. 2006, *exhibit* 6 —dirigida a los secretarios de departamentos, directores de agencias, corporaciones públicas, presidentes de las cámaras legislativas y alcaldes— en la cual reiteraba [7] y exponía las normas relativas al trámite de consultas y opiniones. En lo pertinente, bajo el acápite III, "Casos en los cuales está impedido de emitir opiniones el Secretario de Justicia", hizo constar:

> *Cuestiones que estén sometidas a los tribunales de justicia, casos sub-judice.* Esta norma responde al objeto de mantener deslindada la gestión de la Rama Ejecutiva y de la Rama Judicial y así evitar conflictos entre ambas ramas. Cuando un organismo de gobierno somete una cuestión esencialmente judicial, a ser resuelta finalmente por los tribunales de justicia, *el Secretario de Justicia no accederá a la solicitud de opinión.* (Énfasis suplido.) Carta Circular Núm. 2006 de 15 de marzo de 1985, *exhibit* 6.

El impacto de la opinión que sostenía la nulidad del puesto de Gerente Escolar no se hizo esperar. En lo administrativo, poco tiempo después, la Secretaria del Departamento de Instrucción, Sra. Awilda Aponte Roque, dio por terminados los nombramientos de los gerentes escolares y notificó a cada uno de sus incumbentes su cesantía, bajo la tesis de que eran ile-

---

[7] Por más de medio siglo, dichas normas han prevalecido en el Departamento. Fueron adoptadas y seguidas por los siguientes antecesores del cargo: Salvador Mestre, Carta Circular Núm. 409 de 24 de noviembre de 1919; Rafael Hernández Colón, Carta Circular Núm. 1190 de 8 de diciembre de 1965; Santiago C. Soler Favale, Carta Circular Núm. 1198 de 31 de enero de 1969; Francisco De Jesús Schuck, Carta Circular Núm. 2002 de 4 de enero de 1973; Héctor Reichard de Cardona, Carta Circular Núm. 2005 de 6 de abril de 1983.

gales y por ende, nulos. (8) En lo judicial, en el caso Civil Núm. PE-82-970, el 13 de mayo de 1985, los demandantes Mateo *et al.*, solicitaron sentencia sumaria parcial. En su apoyo, invocaron dicha opinión y las cesantías decretadas.

Al recibir copia de esa solicitud, el Departamento de Justicia pidió urgentemente el 21 de mayo, la paralización de los procedimientos e indicó que "podría haber un posible conflicto entre la posición de [los demandados] y la del Estado". El 30 de mayo de 1985, luego de evaluar una oposición de los demandantes, el tribunal los paralizó por sesenta (60) días.

Durante el transcurso de dicho término, el 17 de junio de 1985, el Secretario de Justicia le comunicó oficialmente al licenciado Romero Barceló haber emitido su opinión de 15 de marzo de 1986 en la que sostenía la ilegalidad del puesto de Gerente Escolar. Hizo referencia expresa al caso Civil Núm. PE-82-970, a la paralización de los procedimientos, y le adelantó que el Estado habría de asumir en dicho caso la posición según expuesta en su opinión. Le indicó que era indispensable le manifestara su "conformidad con la posición que ha de asumir el Estado en el caso de referencia o si por el contrario, desea que se proceda a nombrarle un representante legal para que litigue el nombramiento del puesto de Gerente Escolar en este caso. De ser esta última su decisión, deberá comunicarse con los otros codemandados que se describen en el anejo que se acompaña para que entre todos escojan un abogado de su predilección y me informen al respecto. Los honorarios legales serán sufragados por el Estado conforme a las normas actuales que ha implantado esta Administración". Carta de 17 de junio de 1985, *exhibit* 2.

El 25 de junio de 1985, el licenciado Romero Barceló le contestó al Secretario de Justicia que su opinión era "total-

---

(8)Los Gerentes Escolares afectados, radicaron ante la Corte de Distrito federal para el Distrito de Puerto Rico una demanda por violación a los derechos civiles. *Eduardo Carrasquillo* v. *Awilda Aponte Roque* (caso Civil Núm. 85-1475).

mente opuesta" a la emitida, reiteró que el nombramiento de los Gerentes Escolares era legal y que había redundado en una mejor administración del sistema de enseñanza pública. Le pidió copia de los documentos legales para referirlos al abogado por él seleccionado, el licenciado Urgell Cuebas.

Mientras tanto, el tribunal extendió hasta el 22 de agosto de 1985 el término concedido al Estado para replicar la moción de sentencia sumaria parcial. El 19 de septiembre de 1985 el Departamento de Justicia pidió tiempo adicional, ya que aducía dificultades surgidas por razón de la renuncia del abogado de la División de Litigios que tenía el caso a su cargo; el claro conflicto surgido entre el Estado y los otros codemandados con motivo de la opinión del Secretario, y las complicaciones habidas en cuanto a la selección final del abogado de los restantes codemandados debido a que algunos de ellos insistían en escogerlo unilateralmente. Se consignó que el abogado privado sería el licenciado Urgell Cuebas.

Así las cosas, el 15 de octubre de 1985, cinco (5) meses después de su radicación, el tribunal dictó sentencia sumaria parcial. Reconoció que "[l]os funcionarios públicos demandados en sus caracteres oficiales [Gobernador y Secretaria de Instrucción] quedaron automáticamente sustituidos por aquellos funcionarios incumbentes, a tenor con lo dispuesto por la Regla 22.4 de las de Procedimiento Civil de 1979". Anexo Núm. 1, pág. 2. Señaló "que el Estado resulta[ba] ser un ente con personalidad continua, no sujeto a interrupción alguna por cambio administrativo gubernamental", íd., pág. 12 y que, como demandado, en virtud de la opinión emitida por el Secretario de Justicia, dio "por admitidas todas las alegaciones que relativo al nombramiento y puesto de gerente escolar, presentara la parte demandante para la consideración de este Tribunal. Dichos actos del Estado, adoptados por la Secretaría del Departamento de Instrucción Pública, parte codemandada, son corroborados al ésta proceder a cesantear a los gerentes escolares en cuestión". Íd., pág. 13. En consecuencia, decretó

que los puestos de Gerentes Escolares creados por la anterior Secretaria de Instrucción, Dra. María Socorro Lacot, eran nulos. Dispuso que el caso quedara abierto para ventilar posteriormente las alegaciones sobre discrimen político y daños.

Ante esta situación, el 30 de octubre de 1985, el licenciado Urgell Cuebas compareció al tribunal. Explicó que el 17 de junio el Secretario de Justicia Héctor Rivera Cruz había comunicado al Lic. Carlos Romero Barceló y a la Dra. María Socorro Lacot su autorización para que designasen un abogado privado de su predilección; que el 20 de julio ellos le informaron al Secretario su decisión de seleccionarlo a él; que todavía no había sido contratado, "toda vez que existía un problema en cuanto a la representación legal de los otros codemandados, quienes seleccionaron otro abogado para representarles", y, que mientras se dilucidó y solucionó ese extremo, el caso estuvo bajo el control exclusivo del Departamento. El licenciado Urgell Cuebas asumió inmediatamente la representación del Lic. Carlos Romero Barceló y la Dra. María Socorro Lacot y pidió la reconsideración de la sentencia. También escribió una carta al Lic. Héctor Rivera Cruz en la que expuso su preocupación de que se hubiese dictado la sentencia y de las dificultades surgidas en cuanto a la firma del contrato con el Departamento para asumir la representación. El Secretario de Justicia le contestó y le informó las gestiones y conversaciones habidas durante el período de prórroga concedido por el tribunal para proveer representación adecuada a los otros codemandados, que no era indispensable que se firmara el contrato para asumir tal representación, y le reafirmó su condición de abogado particular del Lic. Carlos Romero Barceló y la Dra. María Socorro Lacot.

Paralelamente, los otros codemandados se quejaron de la misma situación a través del Lic. Eliezer Aldarondo Ortiz, a quien designaron su abogado y oportunamente el Secretario de Justicia no aprobó. El 4 de noviembre de 1985, el licenciado Aldarondo Ortiz también solicitó del tribunal la reconsidera-

ción y el derecho a ser oídos. Al día siguiente, mediante escrito al efecto, el Estado se allanó a esta súplica en atención al *conflicto de intereses* surgido con los demandados a raíz de la opinión del Secretario de Justicia.

El tribunal accedió a la representación legal de los abogados Urgell Cuebas y Aldarondo Ortiz. También decidió examinar la reconsideración y concedió término a los demandantes para replicarla. Oportunamente, previa vista, el 27 de diciembre de 1985, dejó sin efecto la sentencia sumaria parcial. En su resolución expuso que al dictarse la misma "el día 15 de octubre de 1985 ya existía un conflicto de intereses entre el Secretario de Justicia y los restantes demandados por razón de Opinión emitida por dicho funcionario en torno a los gerentes escolares y que se estaban haciendo las gestiones administrativas de rigor para contratarle representación legal a ellos. Véase Carta del 21 de noviembre de 1985 marcada como Exhibit I. El Tribunal desconocía estos hechos al emitir la referida sentencia aunque le había concedido sendas oportunidades a la parte demandada, *entonces representada por el Secretario de Justicia, para oponerse a la solicitud de sentencia sumaria. De haber tenido el Tribunal el beneficio de la información antes expuesta no hubiéramos dictado la sentencia parcial".* (Énfasis suplido.) Resolución y orden del Tribunal Superior, Sala de San Juan de 27 de diciembre de 1985, págs. 1–2.

Finalmente, luego de varios incidentes procesales y de evaluar todos los escritos de las partes, el 31 de julio de 1986, dicho foro declaró sin lugar la sentencia sumaria parcial por entender "que existe controversia de hechos sobre varios aspecto[s] de la controversia de este pleito, la cual se circunscribe a determinar la legalidad o ilegalidad de la creación del puesto de Gerente Escolar o Director Ejecutivo I". *Exhibit* A-A, pág. 1. A su juicio, las "declaraciones juradas en oposición contradicen los hechos contenidos en los documentos expuestos a favor". Íd., págs. 1–2. Contra ese dictamen, recu-

rrieron aquí los demandantes Mateo *et al.* El 10 de octubre de 1985 proveímos no ha lugar. Con posterioridad, los trámites del caso han continuado.

## II

Con fecha de 27 de noviembre de 1985, y presentada el 9 de diciembre, el licenciado Romero Barceló formuló una queja ante el Juez Presidente Interino, Hon. Carlos J. Irizarry Yunqué, la cual aducía, en síntesis, que el Secretario de Justicia violó los Cánones 1, 18, 21 y 30 del Código de Ética Profesional, al "insisti[r] en asumir mi representación legal y la de los demás co-demandados a pesar del inherente conflicto de intereses" (carta de 27 de noviembre de 1985), no mantenerlo debidamente informado, y proveer una defensa inadecuada en el caso aludido. Acompañó varios documentos([9]) y pidió se investigara el asunto por uno o más abogados de reconocida competencia y reputación moral, ajenos a la Oficina del Procurador General. Ese mismo día, el Lic. Héctor Rivera Cruz fue notificado (AB-85-21).

El 10 de diciembre, el licenciado Romero Barceló nuevamente se quejó del proceder del Secretario de Justicia. Esta vez expuso que en el caso Civil Núm. 85-1093, *Resto Ramos et al.* v. *Figueroa Sánchez*, ante la Corte de Distrito de Estados Uni-

---

([9])Resolución, mociones y comunicaciones referentes al caso Civil Núm. PE-82-970 y a los casos Civiles Núms. 84-3028 *Carlos Gutiérrez Rodríguez* v. *Carlos Romero Barceló* y 84-0431, *A.B.H. Vendig 1 Corp.* v. *Hon. Carlos Romero Barceló et al.*, indicativos de sus gestiones tendentes a obtener nombramiento de abogado privado que lo representara.

En estas y otras comunicaciones, en términos generales, el licenciado Romero Barceló se queja de que el Secretario de Justicia Héctor Rivera Cruz le represente indebidamente o le haya negado representación privada injustificadamente. En las comunicaciones no se elabora satisfactoriamente la infracción ética. No consideramos que proyecten problema deontológico análogo al del caso Civil Núm. PE-82-970.

Hemos de aclarar, anticipadamente, que no nos corresponde evaluar directamente decisiones y conducta del Secretario de Justicia que más bien giran en torno a la interpretación e implantación de la Ley Núm. 9, para lo cual existe un recurso de revisión ante el Tribunal Superior.

dos para el Distrito de Puerto Rico, incurrió en una falta de diligencia profesional "aunque, no tan grave", debido a que renunció a la representación del allí codemandado, Juan A. Rosado Alcázar, sin que surgiera que se le hubiera notificado. Se basó en las siguientes expresiones del Juez, Hon. Héctor M. Laffite, de 23 de agosto de 1985:

> Sin pasar juicio sobre los méritos o normas usadas por el Secretario para negarle representación al demandado Rosado Alcázar, ciertamente ningún empleado público que pida la ayuda del Secretario de Justicia bajo la Ley 9 de 1975, según enmendada, debe dejársele al borde de una rebeldía en el momento en que finalmente se llegue a la decisión de no representarlo/la. (Traducción nuestra.)

Dos días después, el Secretario de Justicia fue notificado para que expusiera sus comentarios (AB-85-23).

El 16 de diciembre de 1985, un sinnúmero de ex gerentes y superintendentes escolares —incluyendo varios de los codemandados en el caso Civil Núm. PE-82-970— endosaron la primera queja del licenciado Romero Barceló y se unieron a sus planteamientos.

Una vez notificado, el Secretario de Justicia suscribió contestación jurada el 19 de diciembre de 1985. Luego de cuestionar la suficiencia de las quejas por no haber sido juradas por el licenciado Romero Barceló, hizo un análisis de las mismas y expuso su criterio de que eran infundadas, frívolas e improcedentes, con "intención de hostigar personalmente al Secretario con el propósito de obstaculizar su labor gubernamental". Carta de 19 de diciembre de 1985. Solicitó que las cartas de 27 de noviembre y 10 de diciembre, por no estar juradas, ([10]) fueran devueltas al remitente, el licenciado Romero Barceló; que se ordenara la eliminación de cualquier anota-

---

([10]) Adviértase que el ex Gobernador Romero Barceló es abogado. Como tal, los escritos ante foro judicial, según lo dispuesto en la Regla 9 de Procedimiento Civil, 32 L.P.R.A. Ap. III, no tienen que ser jurados.

ción en el Registro de Quejas, o, en la alternativa, que el asunto fuera archivado.

El 13 de mayo de 1986 denegamos la desestimación solicitada y acordamos estudiar y resolver el asunto en sus méritos. Concedimos a las partes términos para exponer y, por vía de alegatos, ampliar y argumentar sus respectivas posiciones. Estas han comparecido.

III

Se imponen unas reflexiones preliminares. En buena metodología adjudicativa, es menester aclarar que el ejercicio de nuestra jurisdicción disciplinaria está forzosamente limitado a aquellos planteamientos éticos relacionados con el caso Civil Núm. PE-82-970, directamente motivados por la opinión del Secretario de Justicia, Héctor Rivera Cruz, de 15 de marzo de 1985.

Bajo esta óptica, no nos corresponde pasar juicio sobre las controversias jurídicas que penden ante el Tribunal Superior, Sala de San Juan, en la causa civil antes mencionada. Ello compete en esa etapa a dicho foro. Tampoco es procedente evaluar trámites referentes a señalamientos promovidos por el licenciado Romero Barceló, fundados en alegadas negativas del Secretario de Justicia de proveerle representación legal privada en otros casos en que aquél, o terceras personas, figuran como demandados ante los tribunales del país y la corte federal que no presentan problema ético. Cualquier pronunciamiento sobre esos restantes casos nos está vedado, por versar únicamente sobre controversias potenciales de naturaleza judicial que implican interpretar el alcance e implantación de la Ley Núm. 9, *supra*, que no están ante nosotros. Ello es materia que incumbe al Tribunal Superior. Es a ese foro al que la mencionada Ley Núm. 9, *supra*, confiere jurisdicción, en primera instancia, para intervenir directamente y resolver aquellos recursos de revisión que se interpongan en o antes de

transcurridos quince (15) días desde la notificación de una decisión adversa del Secretario. 32 L.P.R.A. sec. 3087.

 Trazado el horizonte decisorio, hemos de notar que bajo el esquema constitucional y estatutario vigente, el Departamento de Justicia, como regla general, es la institución de la Rama Ejecutiva que ostenta la representación legal del Estado Libre Asociado en las causas criminales y civiles. [11] Véase *Pueblo* v. *González Malavé*, 116 D.P.R. 578 (1985). Como miembro con rango constitucional del gabinete del Gobernador, el Secretario de Justicia es el funcionario de mayor jerarquía del Departamento. Es nombrado por el Gobernador, con el consejo y consentimiento del Senado. Por las funciones impuestas por ley, es abogado. Sin embargo, no es un abogado más. Sus responsabilidades legales y administrativas son numerosas y versan sobre múltiples y sensitivos asuntos. Además de las representaciones en casos criminales y civiles en los tribunales, tiene la autoridad de emitir opiniones —y publicar las que estimare de interés general— conforme el Art. 63 del Código Político, 3 L.P.R.A. sec. 71, y así influenciar la política pública. [12] También actúa como consejero legal de otras agen-

---

[11] La Constitución, en su Sec. 6, Art. IV crea, entre otros, dicho Departamento. Su visión ha seguido la tradición norteamericana. Sus antecedentes se remontan a Inglaterra. Nota, *The Origin of the Attorney-General*, 25 L.Q. Rev. 400 (1909); W. S. Holdsworth, *The Early History of the Attorney and Solicitor General*, 13 Ill. L. Rev. 602 (1918); Ross & Millsap, *State and Local Government and Administration*, Nueva York, Ed. Ronald Press Co., 1966, págs. 365-366.

Sin embargo, el modelo puertorriqueño es más amplio. En virtud de los Arts. 1 y 2 de la Ley Núm. 7 de 24 de julio de 1952, según enmendada, 3 L.P.R.A. secs. 8 y 9, —en cumplimiento del mandato de la Sec. 7 del Art. IV de la Constitución— el Secretario de Justicia es el *segundo* sucesor del Gobernador en caso de que simultáneamente, de forma permanente, quede vacante dicho cargo y el del Secretario de Estado, o se produzca en ambos una ausencia de carácter transitorio.

[12] Sobre esta facultad se ha dicho:

"Mucha de la importancia del puesto es el resultado de la función de escribir opiniones. Esta función es única —permite a estos funcionarios influenciar la política pública en modos que muchas veces no son entendidos

cias, autoridades e instrumentalidades, y es miembro de determinados organismos, por disposición de diversos estatutos. ([13])
Estas responsabilidades las descarga directa y personalmente, o a través de sus auxiliares inmediatos y demás subalternos colaboradores, ubicados en el diseño de la organización administrativa. En esta estructura, se destacan las Divisiones de Litigios y la de Opiniones.

Al igual que otros departamentos ejecutivos, cada Secretario proyecta su propio estilo profesional y traza las prioridades y metas a alcanzar en la consecución de la política pública establecida, según su propio juicio y el del Primer Ejecutivo.

También tenemos presente que algunas de las funciones adicionales del Secretario de Justicia señaladas —integrante del Gabinete, segundo en sucesión al Gobernador y miembro

---

por el público. En muchos casos, la opinión vincula legalmente a aquellos que la solicitan. Los jueces se abstienen de rendir una opinión hasta que un caso o controversia real les haya sido sometida. Pero él puede dar una dirección específica a un funcionario público respecto a conflicto de intereses futuros, reales o potenciales. En algunas jurisdicciones no es necesario que le soliciten esas opiniones. De ordinario, al acatar dicha opinión, el funcionario local o estatal queda relevado de cualquier responsabilidad en una situación conflictiva particular. Aun sin tener esa relación de autoridad sobre los funcionarios, el mero hecho de que pueda emitir opiniones legales puede dejar establecida esa influencia sobre esos otros cargos, pues el funcionario público sabe que en otras ocasiones tiene que acudir ante él para asesoramiento legal. Ciertamente estará reacio a ignorar el consejo de ese abogado comunicádole públicamente como una opinión oficial. En otras circunstancias, el funcionario público obedecerá los decretos simplemente porque existen.

"El proceso de redacción de opiniones varía de estado a estado. Sin embargo, se pueden ofrecer ciertas generalidades. Primero, usualmente es un proceso cerrado, posiblemente es el proceso de formulación de decisiones más cerrado en los gobiernos estatales. Usualmente, no hay consejo externo, alegatos, ni se traen a consideración observaciones. Muchas veces, las puertas cerradas son las defensas de funcionarios envueltos en conducta antiética." (Traducción nuestra.) Thompson, Gough & Wallace, *Conflicts of Interest and the States Attorneys General*, 15 Washburn L.J. 15, 16 (1976).

([13]) Entre algunas de estas funciones, cabe mencionar que preside la Comisión Codificadora de las Leyes, 2 L.P.R.A. sec. 222. Es miembro además del Consejo Judicial, 4 L.P.R.A. sec. 307, y de la Junta Consultiva para el Control de la Contaminación de Aguas, 24 L.P.R.A. sec. 594.

de varias juntas y organismos— pueden, directa o indirectamente, involucrarlo o moverlo a involucrarse, en las polémicas de asuntos públicos polarizados, impregnados o no de contenido político-partidista, que trascienden la visión tradicional del papel de principal abogado-asesor gubernamental. La línea es tenue, y por ende, a veces difícil de separar el pronunciamiento a título clásico de Secretario de Justicia (abogado-asesor), y de aquel que irradia como miembro del Gabinete, o una junta, o Gobernador interino.

A la luz de estas realidades, hemos de reconocer que de su faz, es perfectamente legítimo que un Secretario de Justicia pueda sostener una visión administrativa o criterios jurídicos distintos a los de su sucesor u otro. Como corolario de esas diferencias en enfoques y de nueva política pública, pueden surgir conflictos en los distintos órdenes de la comunidad, incluso en asuntos previamente sometidos a los tribunales. [14] Nota, *Professional Ethics in Government Side-Switching*, 96 Harv. L. Rev. 1914, 1915–1916 (1983); J. Weinstein, *Some Ethical and Political Problems of a Government Attorney*, 18 M. L. Rev. 155 (1966). "Las relaciones de los oficiales de una agencia con el abogado del gobierno no son las de cliente-abogado en su sentido ordinario, pues las identidades y deseos de estos oficiales pueden variar con la opinión popular, el voto del electorado, o los caprichos de sus superiores, mientras que la ley a la que tanto los oficiales y abogados deben lealtad permanece inalterada." (Traducción nuestra.) E. Schnapper, *Legal Ethics and the Government Lawyer*, 32 Record of N.Y.C.B.A. 649 (1977).

---

[14] La situación aquí planteada es un vivo ejemplo. La eliminación del puesto de Gerente Escolar formaba parte del compromiso programático del Partido Popular Democrático. En su Primer Mensaje Anual a la Asamblea Legislativa, el Gobernador Rafael Hernández Colón anunció ese propósito como parte de la reforma del sistema de educación pública.

██ Ahora bien, independientemente de las variantes que produzca, en incumbentes y enfoques, la dinámica operacional de nuestra democracia en la Rama Ejecutiva —como resultado de un cambio de administración post eleccionario— las obligaciones principales impuestas por la Constitución y la legislación al cargo de Secretario de Justicia, no varían. Y, aunque posee amplia discreción, la misma no es absoluta. Aun cuando su nombramiento lo origina el Gobernador, con el consejo y consentimiento del Senado, al jurar y tomar posesión del cargo, su fidelidad y comportamiento están afectados y regulados por la Constitución, innumerables disposiciones legales y por el modelo ético que corresponde al ideal de buen abogado "expresado en el preámbulo" del Código de Ética Profesional, 4 L.P.R.A. Ap. IX. Criterio General Canon 1, *in fine*. Como tal, le aplican incuestionablemente los principios deontológicos que regulan la profesión de abogado, con las modificaciones aceptables y cognoscibles resultantes de las peculiaridades inherentes que conlleva esa compleja gestión pública. (15)

██ Lo expuesto no significa que un Secretario de Justicia indefectiblemente esté sujeto a procedimientos disciplinarios por violaciones éticas atribuibles única y directamente a otros abogados del Departamento. En un cargo tan difícil y complejo, el abanico de posibilidades de error de juicio es inmenso. Las probabilidades de incurrir en conflictos, de buena fe y sin intención, es una premisa aceptable. Thompson, Gouth & Wallace, *Conflicts of Interest and the States Attorneys General*, 15 Washburn L.J. 15, 16 (1976).

---

(15) En este aspecto, la prohibición absoluta preceptuada en el Canon 21 de representación por intereses encontrados, "aun cuando ambos clientes así lo aprueban", o el mandato "[c]uando un abogado representa a un cliente por encomienda de otra persona o grupo, quien le paga al abogado por dicho servicio, debe renunciar la representación de ambos tan pronto surja una situación de conflicto de intereses entre la persona o grupo que le paga sus honorarios y la persona a quien representa", no son aplicables. Lo contrario, haría inoperante la Ley Núm. 9 (4 L.P.R.A. Ap. IX).

■ En este sentido, sin que ello signifique la exclusión y evaluación de otros factores, o abdicar automáticamente la jurisdicción disciplinaria, este foro, de ordinario, se abstendrá prudencialmente de asumir y ejercerla en quejas o planteamientos en que de su faz: (1) el promovente no justifique satisfactoriamente un interés legítimo ético y perjuicio real directo; (2) el asunto, aunque de carácter ético, sea prematuro; (3) los hechos no estén debidamente documentados o sustanciados, o (4) no sean materia *ético-adjudicable* por corresponder propiamente al debate del Poder Legislativo o Ejecutivo, o pertenecer a la arena de la política partidista.

■ En reconocimiento a estas realidades, a las múltiples funciones ejecutivas y administrativas, la pluralidad de abogados, los numerosos casos judiciales y consultas, y otros factores, cada situación planteada del género ético que nos ocupa, requerirá una cuidadosa reflexión sobre si asumimos jurisdicción disciplinaria. Además requerirá oportunamente una meticulosa y ponderada depuración de los hechos para fines de fijar si ha habido infracción a algún canon y sobre quién realmente recae responsabilidad.

Bajo este prisma, examinemos los planteamientos de los comparecientes, siguiendo en lo posible, el orden cronológico de los eventos pertinentes antes expuestos.

### IV

*Intereses encontrados* (Canon 21):

Este aspecto contiene la queja principal del licenciado Romero Barceló y de los ex Gerentes Escolares cesanteados. Está fundamentado en la opinión del Secretario de Justicia Rivera Cruz emitida el 15 de marzo de 1985. Conforme nos hemos expresado, lo consideramos crucial, determinante y *ético-adjudicable,* por centrarse sobre una actuación exclusiva del Secretario en su función de abogado-asesor.

En *In re Carrera Rovira y Suárez Zayas*, supra, págs. 788–789, elaboramos así el contenido del canon:

Por su naturaleza, al hablar de intereses encontrados, penetramos la dimensión de las incompatibilidades. Incompatibilidad es término equivalente a antagonismo, oposición, repugnancia que tiene una cosa para unirse con otra, o dos o más personas entre sí. También se refiere a la imposibilidad legal de simultanear dos o más cargos, funciones o misiones una misma persona. El primer significado alude al orden físico, el segundo toca el aspecto moral y el último afecta el orden legal. En materia deontológica se acepta que uno de los requisitos para el ejercicio de la abogacía es la compatibilidad de la actuación con la situación y circunstancias. La premisa es sencilla: quien no sea independiente no está en condiciones de ejercer la profesión. A. Fernández Serrano, *De las incompatibilidades para ejercer la abogacía*, Madrid, Artes Gráficas M.A.G., S.L., 1952, págs. 5–7.

Frente a cualquier lucha del mundo jurídico aparecen, además de una cosa, —sea un bien, un derecho o un interés— dos o más individuos como "señores del conflicto". El abogado actúa siempre a la vista de tal proceso o dentro del proceso mismo. A. A. Mercader, *Abogados*, Buenos Aires, Eds. Jurídicas Europa-América, 1960, pág. 75. La función de abogado tiene, pues, un carácter eminentemente público en cuanto constituye un órgano intermedio entre el juez y los litigantes. A. Fernández Serrano, *La abogacía en España y en el mundo*, Madrid, L.I.D., 1955, T. 1, pág. 65; *Ramírez de Arellano v. Srio. de Hacienda*, 85 D.P.R. 823, 830 (1962). El abogado es el primer enjuiciador de un pleito sobre el cual el juez pronunciará el último dictamen. Mercader, *op. cit.*, pág. 105.

La prohibición contra la representación simultánea de clientes con intereses en conflicto tradicionalmente ha formado parte integral de los códigos de ética. De este modo se busca preservar la autonomía de juicio del abogado y prevenir cualquier tipo de dilución a la fidelidad que debe a su cliente. *Developments in the Law—Conflicts of Interest in the Legal Profession*, 94 Harv. L. Rev. 1244, 1292–1293 (1981).

En el contexto del deber de lealtad, puede decirse que los intereses de dos clientes difieren si son conflictivos, inconsistentes o diversos. *ABA Model Code of Professional Responsibility,* EC 5-14, en T. Morgan y R. Rotunda, *Problems and Materials of Professional Responsibility,* 2da ed., Mineola, N.Y., Foundation Press, 1983 Supp., pág. 30. (Escolios omitidos.)

Estos pronunciamientos nos sirven de punto de partida. El Secretario de Justicia sostiene que hasta el momento en que emitió su opinión el 15 de marzo de 1985 no había conflicto. A tal efecto reproducimos su posición:

. . . [N]o existía motivo alguno que diera razón para pensar que existía un conflicto entre los intereses de los co-demandados y el Departamento de Justicia. El hecho de que se hubiese solicitado la referida opinión no producía de por sí un conflicto de intereses. Debe tenerse presente que el Departamento de Justicia está compuesto por muchas divisiones y un gran número de abogados. La solicitud de una opinión por una agencia de gobierno es canalizada a una dependencia de este Departamento totalmente distinta de la División que tiene a su cargo la defensa de los co-demandados en este pleito. La contención del licenciado Romero Barceló de que el Departamento de Justicia debió haberse abstenido de emitir la opinión solicitada por la Secretaria de Instrucción es absurda. Una de las obligaciones del Departamento de Justicia es ofrecerle asesoría a las dependencias del gobierno y tal obligación no puede ser renunciada. Carta de 19 de diciembre de 1985, pág. 12.

Nos señala que después de la misma:

. . . [E]l Departamento de Justicia no intervino en el caso bajo discusión en forma alguna que pudiera entenderse que existía un conflicto de intereses. Todo lo contrario. Tan pronto surgió *la ocasión en que pudiera señalarse tan siquiera la apariencia* de un conflicto de inter[eses], *que ocurre cuando se radica la Moción de Sentencia Sumaria por los demandantes,* el Departamento actuó de forma diligente y le pidió al Tribunal Superior que paralizara los procedimientos del caso hasta tanto se contratara una representación legal

para los co-demandados externa al Departamento de Justicia. (Exhibit V). Como vemos, la *posibilidad* de un conflicto de intereses fue levantada por el propio Departamento. (Énfasis suplido.) Íd., pág. 13.

Como razón adicional, aduce que el Departamento está compuesto por varias divisiones. Expone:

El hecho de que una división . . . adopte una posición que puede confligir con los intereses de un demandado que está representado por otra división del Departamento no puede obligar al Departamento a contratar representación legal externa al mismo. Cuando el Departamento de Justicia asume la representación de un demandado, de acuerdo a lo dispuesto por la Ley Núm. 9, el abogado que se le asigna a ese demandado deberá defender sus intereses y no está obligado por las determinaciones hechas por otras divisiones del Departamento o por el Secretario. Ese abogado habrá de actuar de acuerdo a su propio criterio y de conformidad a los Cánones de Etica Profesional. Si se exigiera que en cada situación donde pueda surgir *una apariencia de conflicto de intereses* [*sic*] que el Departamento de Justicia tiene que contratar servicios profesionales externos, se actuaría en contra de la discreción que la propia Ley Núm. 9 le concede al Secretario de Justicia. Es responsabilidad de este funcionario decidir si habrá de ser el propio Departamento o un abogado externo al mismo, quien habrá de representar a un demandado que recibe los beneficios de dicha Ley. Esto es así, porque es el Secretario de Justicia el funcionario responsable de armonizar los intereses de un demandado que cualifica para recibir los beneficios de la Ley Núm. 9 y los intereses del Estado en ofrecer esos servicios al menor costo posible para el erario público. Si en cualquier caso donde los intereses de un demandado pueden confligir de alguna forma con los intereses del Estado, se exigiera la contratación de abogados externos al Departamento de Justicia, la situación fiscal del Departamento podría verse seriamente afectada. Íd., págs. 13–14.

Nos argumenta, que como Secretario de Justicia:

. . . [H]a hecho ese balance de intereses en múltiples ocasiones anteriores incluyendo casos en los cuales el demandado

ha sido el licenciado Carlos Romero Barceló. Esto refleja el deseo del Secretario de Justicia de evitar las apariencias de conflicto de intereses, pero no puede conllevar obligación del Secretario de contratar servicios profesionales externos al Departamento en todos los casos donde pueda surgir esta apariencia de intereses encontrados. Hay que resaltar el segundo párrafo del Artículo 17 de la Ley Núm. 9, 32 L.P.R.A., Sec. 3090, el cual dispone lo siguiente:

"Cuando dos o más funcionarios demandados en un mismo pleito soliciten la representación legal del Estado Libre Asociado y tengan intereses que puedan resultar contradictorios, el Secretario de Justicia *podrá* autorizar el que cualquiera de ellos, o todos sean representados por abogados en la práctica privada, costeándose esto según lo dispuesto en el párrafo anterior."

El referido párrafo del Artículo 17 de la Ley [Núm.] 9 sólo contempla la posibilidad de intereses encontrados entre dos o más funcionarios demandados que son representados por el Departamento de Justicia. No contempla la posibilidad de que el conflicto de intereses pueda surgir entre el Estado y el demandado. A[u]n en el caso donde la posibilidad de intereses encontrados surge entre dos o más funcionarios demandados, la ley no es mandatoria sino que faculta al Secretario de Justicia para tomar la decisión de si habrá de contratarse un abogado de la práctica privada. Esto es consistente con todo el articulado de la Ley [Núm.] 9 que descansa en la discreción del Secretario de Justicia para su funcionamiento. El único caso donde la ley contempla que sea un funcionario distinto al Secretario de Justicia el que tome las decisiones de acuerdo con la Ley Núm. 9, es cuando el propio Secretario de Justicia figura como demandado en un pleito y solicite la protección de la citada ley. *En resumen, la Ley Núm. 9 no exige al Secretario de Justicia a contratar servicios profesionales externos al Departamento en ningún caso.* Como hemos visto, el Secretario de Justicia ha contratado estos servicios en varias ocasiones, sin embargo, tal determinación ha estado apoyada en una evaluación por parte de este funcionario de los intereses de los demandados y los recursos económicos con los cuales cuenta el Departamento. (Énfasis suplido.) Íd., págs. 15–16.

Finalmente, en su último escrito, el Secretario de Justicia Héctor Rivera Cruz enfatiza la función de emitir opiniones. Aduce que la razón de ser de la norma de abstención en cuanto a cuestiones sub júdice, responde a mantener una separación entre las labores de la Rama Ejecutiva y la Rama Judicial, a proteger al Secretario de Justicia en su papel de asesor legal gubernamental, y además, que es directiva, no mandatoria, que sufre excepciones en ciertos casos. A tal efecto expone:

> ... En el caso de opiniones sobre asuntos *sub-j[u]dice* la función del Secretario puede verse afectada en la medida en que una decisión contraria de un tribunal desmerece la función de asesor legal del Secretario. En vista de que los derechos envueltos en un caso *sub-j[u]dice* van a ser adjudicados de todas maneras por los tribunales, *el Secretario no debería emitir una opinión legal que pueda luego confligir con la decisión de un tribunal.*
>
> Ahora bien, los tribunales no son afectados por la existencia o no de esta norma, porque está claro que las opiniones del Secretario de Justicia no obligan de forma alguna a los tribunales y estos están completamente libres para tomar la decisión que estimen correcta en derecho. *Por lo tanto, los derechos de las partes en la litigación en particular,* o la función del tribunal, *no son afectados* en forma alguna por una opinión que pueda emitir el Secretario de Justicia en un asunto relacionado. Dicho de otra forma, *el único que se afecta adversamente,* o que puede ser afectado adversamente, al emitir una opinión legal en relación con un asunto que está bajo consideración, es el Secretario de Justicia. En ese caso el Secretario estaría emitiendo una opinión legal sobre un asunto que de todas maneras sería resuelto por los tribunales y que concebiblemente podría ser resuelto en forma contraria a la opinión emitida, en cuyo caso se desmerecería en cierta medida su papel de asesor legal del Gobierno. (Énfasis suplido.) Comparecencia sobre el Aspecto del Servicio de Opiniones que provee el Secretario de Justicia, pág. 4.

En cuanto al caso de autos nos dice:

> Hasta el momento hemos discutido la facultad que tiene el Secretario de Justicia para determinar cuáles son los asuntos

que pueden ser objeto de una opinión por el Departamento. Ahora bien, queremos aclarar que en el caso pertinente a la queja presentada por el licenciado Romero Barceló, *la opinión del Secretario no fue emitida sobre un asunto sub-judice*. Esto se desprende con claridad de un examen de la opinión del Secretario en respuesta a la solicitud de la Secretaria de Instrucción *sobre la legalidad de la posición de Gerentes Escolares y el curso de acción que en derecho podía seguir la Secretaria de Instrucción en relación a los empleados que desempeñaban estas funciones desde la posición de Director Ejecutivo I.*

En el caso que se encontraba pendiente ante el Tribunal Superior, los demandantes eran empleados del Departamento de Instrucción que ocupaban la posición de Superintendente de Escuelas. *Nada resolvió la opinión del Secretario de Justicia con relación a la reclamación específica de los demandantes en ese caso.* La opinión del Secretario fue motivada por la solicitud que le hizo un jefe de agencia sobre la legalidad de una posición en el sistema de personal gubernamental y sobre las medidas que ese funcionario podía tomar conforme a derechos sobre unos empleados que desempeñaban las funciones de tal posición. *El hecho de que la opinión del Secretario se manifestara sobre un asunto que luego fue resuelto por el Tribunal en un caso, no quiere decir que el Secretario de Justicia emitió una opinión sobre un caso sub-judice.*

Si se interpreta que el Secretario de Justicia no puede expresarse sobre un asunto respecto al cual un funcionario de gobierno, autorizado para ello, ha requerido una opinión, el resultado sería una restricción excesiva ilegal y posiblemente inconstitucional de la obligación del Secretario de Justicia. Son múltiples las ocasiones en que al Secretario se le solicita su opinión sobre un asunto que puede estar pendiente de solución judicial a ese momento. Si el Secretario se abstuviera de asesorar en todas esas ocasiones a los funcionarios que solicitan su asesoramiento, el Gobierno quedaría desprovisto de consejo legal con relación a asuntos de gran importancia para el Pueblo.

El caso pertinente a la queja ante este Honorable Foro, es un claro ejemplo de lo expresado. Un nuevo jefe de agencia adviene a dirigirla y solicita asesoría sobre *un asunto que podía ser resuelto en un caso iniciado por otras personas ante*

*un tribunal.* Ante esa situación, el Secretario de Justicia no podía evitar asesorar a ese nuevo incumbente para que él pudiera tomar una decisión ilustrada y conforme a derecho sobre un asunto de gran importancia para la administración pública.

Por otro lado, adoptar una interpretación de la limitación autoimpuesta por el Secretario de no emitir opiniones sobre casos [*sub-judice*], incluye cualquier situación en la cual el asunto referido para estudio podría ser resuelto por un tribunal, haría la norma una de muy difícil implantación. Existen muchos casos en los cuales el Departamento de Justicia no es parte y en los cuales se plantean controversias con respecto a las cuales se ha consultado al Secretario. En tales casos sería imposible para el Secretario conocer cualquier problema en el sentido antes discutido. Más aún, en casos en los cuales el propio Departamento de Justicia es parte y en los cuales se puede resolver un asunto sobre el cual también se ha solicitado asesoría, es muy difícil que el Secretario advenga en conocimiento de la situación. Sólo hay que recordar el tamaño del Departamento de Justicia y los muchos abogados que trabajan en el mismo, para comprender las dificultades. (Énfasis suplido y escolio omitido.) Íd., págs. 6–7.

## V

▆▆▆▆▆ No tiene razón el Secretario Rivera Cruz. La expresión "sub júdice" simplemente significa "pendiente de resolución judicial". F. Gómez de Liaño, *Diccionario Jurídico*, Salamanca, Ed. Gráficas Cervantes, 1979, pág. 291. Su opinión de 15 de marzo de 1985 versó indiscutiblemente sobre la legalidad del puesto de Gerente Escolar. Distinto a su criterio, dicha opinión se proyectó sobre la controversia pendiente en el caso Civil Núm. PE-82-970 en dos vertientes: sobre los demandantes, reconociéndoles su reclamo de ilegalidad, y sobre los demandados, negándosela. Dudamos que pueda existir una situación más clara en que un Secretario de Justicia emite una opinión sobre un caso sub júdice.

En virtud de esa opinión es que incurrió en un claro conflicto de intereses. No actuó prudente y diligentemente, acorde

con las circunstancias impuestas por el caso Civil Núm. PE-82-970 y la representación legal simultánea que ostentaba. Examinemos detenidamente sus argumentos.

El primero es erróneo. Se basa en la premisa de que dicho conflicto "ocurrió" cuando los demandantes Mateo *et al.*, presentaron la solicitud de sentencia sumaria. La cronología es equivocada. Desde el instante en que acogió la consulta de la Secretaria de Instrucción, Sra. Awilda Aponte Roque, y arribó a una conclusión adversa a los intereses de los codemandados los Gerentes Escolares, el licenciado Romero Barceló y la doctora Lacot —y a tal efecto suscribió la opinión el 15 de marzo de 1985— surgió indubitadamente un conflicto de intereses. Los términos inequívocos en que estaba redactada, sus directrices y resultados no permiten otra conclusión.

En el segundo argumento el Secretario de Justicia intenta establecer a priori un deslinde entre sus funciones como abogado de una parte en un pleito judicial —a través de la División de Litigios— y su misión de atender y opinar, por mediación de la División de Opiniones, las consultas originadas en las diversas agencias y dependencias gubernamentales.

Reconocemos que existen situaciones legítimas, que debido a la naturaleza confidencial del asunto o investigación —*Santiago v. Bobb y El Mundo, Inc.*, 117 D.P.R. 153 (1986) ; *Soto v. Srio. de Justicia*, 112 D.P.R. 477, 495 (1982)— no es permisible, recomendable, ni exigible, que determinada información esté internamente accesible y disponible a las distintas divisiones del Departamento de Justicia, incluyendo algunos abogados y demás funcionarios. En atención a ellas, es también comprensible que el Secretario de Justicia, en determinados momentos, no conozca detalles e información al respecto. Sería absurdo, y físicamente imposible, exigirle que diariamente se reuniera con todos los fiscales, abogados y demás subalternos para conocer los detalles de sus labores. En tales circunstancias, el acceso restringido a esa información en particular —y sus efectos sobre casos civiles, investigaciones,

casos criminales y opiniones en consulta del Secretario de Justicia— pueden explicar el que, en un momento dado, se produzcan *bona fide* posiciones antagónicas o de intereses en conflicto, que una vez aclaradas, despejen toda duda de impropiedad ética.

Por tal razón, no podemos tajantemente aceptar —con carácter absoluto e ilimitado— la dicotomía de abogado-asesor. Salvo las situaciones consideradas, como regla general, para fines éticos y como titular de Justicia, el deber es uno e infraccionable. El principio deontológico en que se apuntala la prohibición de intereses encontrados, no puede quedar diluido ni inmerso en la burocracia administrativa o en la pluralidad de abogados y casos del Departamento. No concebimos que el Secretario de Justicia puede actuar aisladamente en un compartimiento sellado, ajeno o distanciado de los asuntos y decisiones de *importancia* del Departamento. Fuera de los detalles rutinarios —sobre los cuales es imposible imputarle conocimiento— en los asuntos de relieve y trascendencia le corresponde ordenar satisfactoriamente las labores y obligaciones internas, y diseñar mecanismos para mantenerse informado de los mismos. Véase *Pueblo* v. *Ayala Rodríguez,* 116 D.P.R. 382 (1985).

No es oponible, por ser inaplicable en la situación planteada, su proposición de que no se le puede exigir al Departamento de Justicia que contrate los servicios profesionales privados "en cada situación donde pueda surgir una apariencia de conflicto de intereses", pues a su juicio ello atentaría contra la discreción conferida por la Ley Núm. 9, *supra,* y afectaría adversamente la situación fiscal del Estado. No podemos suscribir esta proposición tan categóricamente. Asumiéndola como correcta, aun así, su proceder en el caso de autos no ha sido debidamente justificado. Aquí no se trataba de una mera *apariencia.* Conforme sus propias normas, el Secretario de Justicia Héctor Rivera Cruz debió abstenerse de considerar la

consulta de la Secretaria de Instrucción, Sra. Awilda Aponte Roque. No lo hizo. Decidió acogerla.

Al partir de la hipótesis de que en sus inicios la consulta fue canalizada rutinaria y directamente a la División de Opiniones, sin su intervención, y por ende, la desconocía, ciertamente en la etapa ulterior en que la suscribió, advino en pleno conocimiento. Al hacerlo, repetimos, surgió un evidente e insuperable conflicto de intereses. El conflicto lo generó él y no sus representados originales, los codemandados Gerentes Escolares, el Lic. Carlos Romero Barceló y la Dra. María Socorro Lacot. Desde ese instante, como Secretario de Justicia y autor de la misma, le correspondía adoptar las medidas necesarias para subsanar la situación creada. Primeramente, pudo comunicarles —como demandados potencialmente afectados— su intención de suscribir una opinión legal contraria a sus intereses, brindándoles desde ese instante la oportunidad de seleccionar una nueva representación legal, separada e independiente del Departamento. Como otra alternativa, una vez suscrita la opinión y conocido su impacto y trascendencia en el caso Civil Núm. PE-82-970, debió notificarla inmediatamente, informándoles que por dicha razón el Departamento no podía seguir representándolos —como tampoco a los restantes demandados— y que podían seleccionar un abogado privado a ser contratado por el Departamento de Justicia. No siguió ninguna de estas opciones.

■ No nos persuade su tesis de que el Art. 17 de la Ley Núm. 9 sólo visualiza intereses encontrados entre dos o más funcionarios demandados y no entre el Estado. Primero, por su naturaleza intrínseca, en materia de esta legislación, no podemos atribuirle a la Asamblea Legislativa el propósito desarticulado de establecer el derecho a representación legal bajo un esquema totalmente ajeno o inconsistente a los postulados éticos básicos impuestos al abogado. En la medida que no resulten incompatibles, los principios esenciales deontológicos

son de aplicación en la implantación de la Ley Núm. 9. "El legislador no puede —racionalmente— colocarse en el supuesto de que el orden normativo que establece o contribuye a organizar llegue a ser apto para otorgar facultades cuyo ejercicio llegue a contrariar el orden moral. . . . Deja entonces al Juez la posibilidad de apreciar si esa actividad (formalmente lícita) debe ser amparada jurídicamente en razón de su contenido y fines." C. Mouchet, *Los conflictos entre la moral y el derecho*, XX Rev. Jur. U.P.R. 1, 7–8 (1950).

Y segundo, el argumento del Secretario de Justicia pasa por alto los efectos *ex proprio vigore* de la Regla 22.4 de Procedimiento Civil. Bajo su dinámica procesal, los codemandados, licenciado Romero Barceló y la doctora Lacot, quedaron automáticamente sustituidos en su capacidad oficial por los nuevos incumbentes de los cargos de Primer Ejecutivo y Secretaria de Instrucción, a saber, el Lic. Rafael Hernández Colón y la Sra. Awilda Aponte Roque. Sin embargo, ello no alteró la causa de acción *personal* contra el licenciado Romero Barceló y la doctora Lacot. Aun bajo la tesis de que eran partes nominales, continuaban demandados. Seguían representados simultáneamente por el Departamento de Justicia. Precisamente, fue la Sra. Awilda Aponte Roque, incorporada como codemandada en el caso Civil Núm. PE-82-970 por razón de su cargo, quien le consultó la legalidad del puesto de Gerente Escolar. Ese pedido era sobre la controversia medular en dicho caso. El Secretario de Justicia Héctor Rivera Cruz inexplicablemente accedió, sin adoptar las medidas necesarias a su alcance para salvar esta situación.

Ante esta realidad procesal y fáctica —aun bajo la interpretación restrictiva que del Art. 17 de la Ley Núm. 9, *supra,* nos propone el Secretario— ¿puede sostenerse válidamente que no existieron "intereses encontrados entre dos o más funcionarios demandados que [eran] representados por el Departamento de Justicia"? La contestación es obvia. No requiere ulterior elaboración.

La gravedad ética de su actuación se manifiesta en toda su extensión si recordamos que, en virtud de las directrices específicas contenidas en la opinión del licenciado Rivera Cruz a la Secretaria de Instrucción, señora Aponte Roque, ella dio por terminados los nombramientos de los Gerentes Escolares y les notificó sus cesantías bajo la tesis del Secretario de Justicia de que eran ilegales y nulos. Es evidente pues, que mediante dicha opinión, los demandantes Mateo *et al.*, obtuvieron directa y extrajudicialmente el remedio solicitado en el caso Civil Núm. PE-82-970. En este sentido, no caben argumentos sólidos en qué basar la teoría de que los Gerentes Escolares eran demandados *nominalmente*. El impacto y perjuicio real sufrido por ellos —a la sazón representados por el Secretario de Justicia— es más intenso y trasciende el de los codemandados licenciado Romero Barceló y doctora Lacot. La situación a posteriori de que contrataran al licenciado Aldarondo Ortiz como abogado privado, no les liberó de la consecuencia de que fueran cesanteados a tenor con la opinión del Secretario.

Finalmente, si bien no nos corresponde en el caso de autos analizar *in extenso* la sabiduría y razón de ser de la norma de abstención del Secretario de Justicia sobre opiniones en casos sub júdice, no podemos compartir su explicación de que la única consecuencia de su inobservancia, sería desmerecer su papel de asesor legal gubernamental de no prevalecer eventualmente en los tribunales. Según hemos visto, aquí su opinión afectó y perjudicó a sus representados, los Gerentes Escolares demandados, quienes administrativamente, poco después, fueron cesanteados de sus cargos por la Secretaria de Instrucción. Además, al versar su opinión sobre el *issue* central del caso, ¿por qué en lugar de emitirla —previa renuncia y autorización a los Gerentes Escolares y codemandados licenciado Romero Barceló y doctora Lacot de contratar abogado privado— en vista de lo avanzado del caso Civil Núm. PE-82-970, no optó prudencialmente por plantear los méritos de sus tesis jurídica directamente al foro judicial? Ciertamente causa inquietud su

inexplicable curso de acción, en particular ante el conflicto de intereses que generaba. El Secretario de Justicia no nos ha demostrado las circunstancias particulares, de excepción, para apartarse de la norma de autoabstención sobre asuntos sub júdice.

## VI

*Deber de información* (Canon 19) :

El licenciado Romero Barceló se queja de que el Secretario de Justicia Héctor Rivera Cruz violó este deber ético, pues le informó tardíamente de la opinión emitida y, además, no le comunicó a tiempo sobre la solicitud de sentencia sumaria, aun cuando era evidente el conflicto de intereses. Tiene razón.

El Canon 19 del Código de Ética Profesional señala:

El abogado debe mantener a su cliente siempre informado de todo *asunto importante* que surja en el desarrollo del caso que le ha sido encomendado. (Énfasis nuestro.) 4 L.P.R.A. Ap. IX.

En *Colón Prieto* v. *Géigel*, 115 D.P.R. 232, 239–240 (1984), al adentrarnos en los contornos éticos de este precepto, expusimos:

Este deber, cuya génesis es el "principio de información", significa que el abogado, además de representar a un cliente con fidelidad, lealtad y diligencia, debe siempre mantenerlo informado de todo asunto importante que surja en el desarrollo del caso cuya atención le ha sido encomendada. *In re Cardona Vázquez*, 108 D.P.R. 6, 18 (1978).

No es necesario mucho esfuerzo mental para aceptar que una sentencia de archivo —o en sus méritos— que pone fin parcial o adjudica totalmente la causa de acción y derechos, claramente cae entre los asuntos a ser informados inmediatamente por el abogado al cliente. "El principio de información desarrolla su eficacia también durante la tramitación del litigio *y en su fase conclusiva. El abogado está llamado a informar diligentemente y a su debido tiempo a su asistido sobre las vicisitudes de la controversia, con mayor premura y atención cuando el mismo cliente sea sujeto activo de deter-*

*minadas vicisitudes procesales . . .".* Lega, *op. cit.,* pág. 143.
*Principio de Diligencia*

En Puerto Rico rige lo que la doctrina denomina "principio de diligencia". "Los comportamientos contrarios a la diligencia se consideran negligentes." Lega, *op. cit.,* pág. 122. "Siendo la lucha la ley de la actividad jurídica, quien es negligente no ejerce, sino sólo simula ejercer el derecho." J. B. Iturraspe, *Función Social de la Abogacía,* 2da ed., Santa Fe, Argentina, Ed. Castellví, 1967, pág. 44. Invariablemente hemos requerido de los abogados "celo, cuidado y diligencia" en la tramitación de asuntos judiciales. *Acevedo* v. *Compañía Telefónica de P.R.,* 102 D.P.R. 787, 791 (1974); *In re Rodríguez Torres,* 104 D.P.R. 758, 765 (1976). (Énfasis en el original.)

En oposición a este señalamiento, el Secretario de Justicia sostiene que no venía obligado a notificarle al licenciado Romero Barceló lo reclamado, pues el asunto no era de importancia ni estaba relacionado con una decisión que éste tuviera que tomar. A juicio suyo, la sentencia sumaria "era un aspecto de derecho en el cual el cliente no tiene que tomar decisión alguna". Aduce que los abogados de la División de Litigios entendieron que no debían oponerse a esa solicitud debido a que podía surgir la apariencia de conflicto de intereses. Por tal motivo, pidieron que el tribunal aplazara su consideración en lo que se proveían los abogados externos del Departamento. Argumenta además que no se le puede exigir al Secretario de Justicia "la obligación de mantener informadas a todas las personas que de alguna forma sean representadas por abogados del Departamento". Concluye:

Que la cantidad de casos de abogados en el Departamento impide se le exija al Secretario de Justicia tal obligación. Todos los abogados del Departamento de Justicia tienen que cumplir con las exigencias de los Cánones de Etica Profesional. El Secretario de Justicia no puede estar expuesto a procedimientos disciplinarios por cualquier alegada violación de un canon por parte de un abogado del Departamento. Las consecuencias funestas que [e]sto tendría son evidentes.

■ Reiteramos nuestros pronunciamientos en *Colón Prieto* v. *Géigel*, supra, en cuanto al deber del abogado de cumplir con el principio de información.

■ Reafirmamos también que, como regla general, el Secretario de Justicia no está expuesto a procedimientos disciplinarios por violaciones éticas o errores de sus subalternos. No puede exigírsele conocimiento real o constructivo sobre todos los asuntos, casos, incidentes y escritos generados por los numerosos abogados y fiscales del Departamento de Justicia. No obstante, existen situaciones peculiares, como la de autos, en que debido a su importancia e intervención activa y directa, su responsabilidad ética es indelegable. Su participación no se proyectó sobre un trasfondo rutinario o del cual estuviera ajeno. Veamos.

Según reseñado, desde el 11 de febrero de 1985, el licenciado Romero Barceló le había comunicado al Secretario de Justicia directamente su preocupación en torno a las consecuencias que podría tener la cancelación de los contratos privados que proveían representación legal, posibles conflictos de intereses y la necesidad de que le informara el estado de los casos pendientes en su contra. En sus cartas fechadas 11 y 15 de marzo de 1985, el Secretario le reiteró al licenciado Romero Barceló, previo examen de todos los casos, su determinación de que los abogados del Departamento de Justicia continuarían representándolo. Y en la carta del Secretario de Justicia Héctor Rivera Cruz, fechada 17 de junio de 1985, informándole oficialmente su opinión al licenciado Romero Barceló, hizo referencia expresa a la paralización del trámite en el caso Civil Núm. PE-82-970. Razonablemente se infiere que el Secretario de Justicia se mantenía informado de los casos aludidos, y en particular, tenía conocimiento de la solicitud de sentencia sumaria.

No podemos coincidir con el Secretario de Justicia Héctor Rivera Cruz de que la solicitud de sentencia sumaria presen-

tada en el caso Civil Núm. PE-82-970 era un incidente de poca trascendencia. Aun cuando aceptáramos que no toda solicitud de sentencia sumaria requiere notificación al cliente contra quien va dirigida, circunstancias pragmáticas y de buena práctica forense aconsejan un mínimo de información, máxime en una etapa en que surgen intereses encontrados entre abogado y cliente.

Nuevamente, en el trasfondo fáctico y procesal aquí aludido, y en consideración de que la génesis de dicha solicitud de sentencia sumaria fue la propia opinión del Secretario de Justicia, no vemos cómo puede justificarse la tardanza en notificarla al licenciado Romero Barceló y a los otros demandados.

## VII

*Suficiencia de la defensa* (Cánones 1 y 18) :

En este señalamiento el licenciado Romero Barceló expone que la defensa provista en el caso Civil Núm. PE-82-970, en cuanto a los trámites referentes a la sentencia sumaria, fue inadecuada. Le imputa al Secretario Rivera Cruz abandono de los intereses de los demandados y no haber contratado rápidamente ni remitido el expediente del caso al licenciado Urgell Cuebas.

Previamente hemos aludido a los problemas surgidos en cuanto a la coordinación y contratación legal de los abogados privados para los otros demandados. Algunos de éstos insistían en que se contrataran dos abogados, mientras el Secretario de Justicia entendía que uno solo era suficiente. Hubo desacuerdos legítimos al efecto. Ello causó dilaciones razonables y justificadas. Finalmente, el foro judicial dejó sin efecto la sentencia sumaria parcial. No se nos ha señalado perjuicio alguno excepto las vicisitudes y aprehensiones que naturalmente este tipo de incertidumbres causa.

En estas circunstancias, no creemos que se haya violado el principio deontológico de diligencia profesional. Todo tiende a

retrotraerse al conflicto de intereses encontrados surgido por la opinión emitida por el Secretario de Justicia el 15 de marzo de 1985 y su inexplicable tardanza en notificarla al quejoso licenciado Romero Barceló y demás codemandados.

## VIII

Tampoco encontramos mérito en la queja promovida por el licenciado Romero Barceló en torno al procedimiento ante el foro federal en el caso Civil Núm. 85-1093, *Resto Ramos et al.* v. *Figueroa Sánchez*. Primero, ello correspondía al propio Rosado Alcázar. Segundo, la cuestión versa sobre unos extremos del trámite seguido por el Secretario de Justicia Héctor Rivera Cruz al negarle al señor Rosado Alcázar los beneficios de la Ley Núm. 9, que según indicado, es materia que debió dilucidarse mediante revisión judicial directa. Y tercero, en su comparecencia, se explican satisfactoriamente las diligencias desplegadas al respecto. Procede el archivo de la queja AB-85-23.

## IX

Recapitulando, el Secretario de Justicia, Héctor Rivera Cruz —al suscribir el 15 de marzo de 1985 la opinión de que el puesto de Gerente Escolar, tal como fue creado, clasificado e implantado era ilegal y contrario a las leyes y reglamentos aplicables, y que procedía la separación de aquellas personas que lo ocupaban— infringió el Canon 21 de Ética Profesional, en cuanto al valor deontológico primario que lo inspira. Incurrió en un claro e insalvable conflicto de intereses por razón de la representación legal simultánea que ostentaba de los Gerentes Escolares demandados y los codemandados licenciado Romero Barceló y la doctora Lacot en el caso Civil Núm. PE-82-970, y la señora Aponte Roque. Actuó además en contra de las normas de abstención relativas al trámite de consultas y opiniones adoptadas por él ese mismo día. Infringió además el Canon 19 de Ética Profesional, pues durante un

período de tiempo irrazonable, no cumplió con el deber de información que dicho canon exige de mantener a sus representados debidamente informados.

Concluimos que es inmeritoria e infundada la queja AB-85-23 formulada por el licenciado Romero Barceló en torno a la defensa en el caso Civil Núm. 85-1093, *Resto Ramos et al.* v. *Figueroa*, ante la Corte de Distrito de Estados Unidos para el Distrito de Puerto Rico. Procede su archivo. Igual solución se impone en cuanto a los señalamientos genéricos del licenciado Romero Barceló que versan, en esencia, sobre la interpretación y aplicación de la Ley Núm. 9 de 26 de noviembre de 1975 por el Secretario de Justicia en otros casos. Ello es materia judicial que compete dilucidar al tribunal de primera instancia en recursos directos de revisión.

## X

Resta al Tribunal decidir la sanción disciplinaria. Descargamos esta misión con absoluta ecuanimidad y con exclusión "[de] toda posible apariencia de que [somos] susceptible[s] de actuar a base de influencias de personas, grupos o partidos, o de ser influido[s] por el clamor público, por consideraciones de popularidad o notoriedad, o por motivaciones impropias". Canon XI de Ética Judicial, 4 L.P.R.A. Ap. IV-A. Sobretodo, conscientes de que somos depositarios "[de] la fe de un pueblo en la justicia", y de la importancia que representa de inalterablemente actuar —ante reclamos legítimos contra cualesquiera funcionarios de los Poderes Ejecutivo y Legislativo— como "factor de equilibrio en la estructura gubernamental de nuestro sistema de vida democrática". Cánones I y XIII de Ética Judicial, *supra*.

Hasta el presente, en lo normativo, en la esfera de la gestión pública del Secretario del Departamento de Justicia, no existían precedentes relativos a los planteamientos éticos aquí implicados. En sus méritos, el asunto es un vivo ejemplo en que las "fronteras y aplicación tajante de algunos cánones de ética

a veces resultan complicadas". *In re Carrera Rovira y Suárez Zayas,* supra, págs. 783–784.

De la comparecencia del Secretario de Justicia se traslucen claros indicios de que su conducta, en algunos extremos, se fundamentó en juicios erróneos e interpretaciones equivocadas sobre el ejercicio de su discreción bajo la Ley Núm. 9, *supra,* sus obligaciones legales y las limitaciones en la dimensión ética dimanantes de su compleja función dual como principal abogado-asesor del Ejecutivo. También aflora en este incidente una aparente falla en los canales internos de comunicación, o una inadecuada coordinación, entre las distintas divisiones del Departamento. Ello atenúa, pero no precluye las sanciones.

El Secretario de Justicia tenía la responsabilidad de canalizar la consulta de la Secretaria de Instrucción, señora Aponte Roque a través de su oficina o mediante un mecanismo rutinario preestablecido. Bajo cualesquiera medios, su deber era haber salvado o evitado incurrir en el conflicto de intereses entre sus representados por razón del caso Civil Núm. PE-82-970. Su intervención directa y personal en esta consulta y opinión es innegable.

Los errores forman parte de nuestra fragilidad humana. Debe recordarse que reconocerlos, aunque es difícil, ennoblece. Después de todo, "siempre es preferible, al decir de NATIELO: '*Ser padre de los propios errores que esclavo de los pareceres ajenos*' ". Cavinie Corallini, *El juez frente a la verdad y la certeza de su fallo, único camino a seguir,* 853 Rev. Not. (Núm. Especial), 1980, págs. 2041, 2055. En estas circunstancias, en justicia, circunscribimos la misma a una censura y amonestación. *In re Ríos,* 112 D.P.R. 353, 364 (1982); *In re Criado Vázquez,* 108 D.P.R. 642, 644 (1979); *In re Rodríguez Torres,* 104 D.P.R. 758, 765 (1976); *Alonso García* v. *Comisión Industrial,* 102 D.P.R. 752, 755 (1974); *In re González,* 92 D.P.R. 544, 545 (1965). En lo sucesivo, el Secretario de Justicia queda apercibido de su deber de adoptar las medidas cautelares necesarias para evitar situaciones

análogas. En esa tarea, en última instancia, debe "tener presente que su ministerio radica en su conciencia libre, independiente y alerta, que le dicte las pautas a seguir para un comportamiento debido y correcto. Su mejor recurso será su probidad y prudencia y una evaluación de su situación a la luz de la totalidad de los hechos particulares". *In re Carreras Rovira y Suárez Zayas*, supra, pág. 795.

*Se dictará la correspondiente sentencia.*

El Juez Presidente Señor Pons Núñez y el Juez Asociado Señor Alonso Alonso emitieron opiniones disidentes. La Juez Asociada Señora Naveira de Rodón y el Juez Asociado Señor Hernández Denton se inhibieron.

—O—

Opinión disidente del Juez Presidente Señor Pons Núñez.

Los hechos que dan lugar a la querella presentada, que se encuentran expuestos en la opinión que por voz del Juez Asociado Señor Antonio Negrón García emiten tres jueces de este Tribunal, a mi juicio, no justifican una censura o amonestación aun cuando ellos constelen una situación indeseable.

Las circunstancias de imprecisión y falta de guías en la legislación y reglamentación atinentes, las exigencias de la norma pública (*public policy*) establecida, su propia iniciativa de traer prontamente a la atención de quienes correspondía la emisión de esa opinión, la ausencia de prueba en cuanto a motivaciones impropias, la ausencia de daños, el trasfondo que le sirve de marco y los pronunciamientos anteriores de este Tribunal relativos a la ausencia de normas reglamentarias claras al momento de ocurrir la conducta en cuestión, no justifican la censura y amonestación contenida en dicha opinión. Veamos.

I

*Primero*: El estatuto (¹) que le impone al Secretario de Justicia de Puerto Rico la obligación de representar o proveer representación a los querellantes, y resolver sobre la procedencia del pago por el Estado de la sentencia que pueda recaer, no contempla una situación como la que da lugar a esta querella.

Por una parte, el Señor Gobernador de Puerto Rico, una vez electo, implantó una norma pública que surgió del programa de gobierno aprobado por el electorado del país en las elecciones generales de 1984. Esa norma pública consistió en la eliminación del puesto de Gerente Escolar. Por otra parte, desde 1982, antes de ocurrir el cambio de administración gubernamental, se tramitaba el caso Civil Núm. PE-82-970. (Véase pág. 832 y esc. 2 de la opinión aludida.) En dicho caso los aquí querellantes fueron demandados y comparecieron, en síntesis, a defender la posición de Gerente Escolar.

Con el advenimiento de una nueva administración de gobierno, en 1985, vienen a coincidir en el Secretario de Justicia de Puerto Rico ambas responsabilidades: la de ofrecer el asesoramiento jurídico necesario para implantar la nueva norma pública, y la de representar, o proveer representación, y resolver sobre la procedencia del pago de la sentencia que pudiera recaer, relacionada con actuaciones contrarias a esa norma pública.

La Ley Núm. 9 de 26 de noviembre de 1975, según enmendada, 32 L.P.R.A. sec. 3085 *et seq.*, no ofrece guías para atender tal situación. No indica qué interés debe prevalecer o tener prioridad: si el presuntamente colectivo, encarnado en la norma pública, o si el particular de los querellantes. En ausencia de tales guías es que el Secretario de Justicia, o sus subal-

---

(¹)Ley Núm. 9 de 26 de noviembre de 1975, según enmendada, 32 L.P.R.A. sec. 3085 *et seq.*

ternos, actuaron en este asunto y se emitió la opinión antes aludida.

Es claro cuál interés debe prevalecer cuando la norma pública es contraria a las leyes, la ética o las buenas costumbres. En tal caso la norma pública claramente tiene que ceder y la obligación del señor Secretario de Justicia sería mantener y vindicar la ley, la ética o las buenas costumbres. Su condición de miembro de gabinete no le obliga a violentar su conciencia o su deber ético.

*Segundo*: Existe incertidumbre en cuanto a la aplicabilidad de los Cánones de Ética Profesional a la situación de autos, lo cual se hace evidente cuando en el escolio núm. 15 la opinión de la mayoría de los jueces participantes reconoce que no todo el Canon 21 de Ética Profesional, 4 L.P.R.A. Ap. IX, puede ser aplicable a este asunto, pues aplicarlo en su totalidad ". . . haría inoperante la Ley Núm. 9". Veamos cómo dispone el Canon 21, *supra*, para poder entender claraménte lo que se hace en el escolio núm. 15 de dicha opinión.

### Canon 21. Intereses encontrados

El abogado tiene para con su cliente un deber de lealtad completa. Este deber incluye la obligación de divulgar al cliente todas las circunstancias de sus relaciones con las partes y con terceras personas, y cualquier interés en la controversia que pudiera influir en el cliente al seleccionar su consejero. Ningún abogado debe aceptar una representación legal cuando su juicio profesional pueda ser afectado por sus intereses personales.

No es propio de un profesional el representar intereses encontrados. Dentro del significado de esta regla, un abogado representa intereses encontrados cuando, en beneficio de un cliente, es su deber abogar por aquello a que debe oponerse en cumplimiento de sus obligaciones para con otro cliente.

La obligación de representar al cliente con fidelidad incluye la de no divulgar sus secretos o confidencias y la de adoptar medidas adecuadas para evitar su divulgación. Un abogado no debe aceptar la representación de un cliente en asuntos que puedan afectar adversamente cualquier interés

de otro cliente anterior ni servir como árbitro, especialmente cuando el cliente anterior le ha hecho confidencias que puedan afectar a uno u otro cliente, [*aun cuando ambos clientes así lo aprueban.*] Será altamente impropio de un abogado el uti·lizar las confidencias o secretos de un cliente en perjuicio de éste.

Un abogado que representa a una corporación o sociedad ·le debe completa lealtad a la persona jurídica y no a sus socios, directores, empleados o accionistas y solamente puede representar los intereses de dichas personas cuando los mismos no vengan en conflicto con los de la corporación o sociedad.

[*Cuando un abogado representa un cliente por encomienda de otra persona o grupo, quien le paga al abogado por dicho servicio, debe renunciar la representación de ambos tan pronto surja una situación de conflicto de intereses entre la persona o grupo que le paga sus honorarios y la persona a quien representa.*] (Énfasis y corchetes nuestros.) Canon 21 de Ética Profesional, 4 L.P.R.A. Ap. IX.

Sencillamente en ese escolio se eliminan, para este caso en particular, las disposiciones entre corchetes. Eliminar la frase "aun cuando ambos clientes así lo aprueban" tiene el efecto de hacer aprobable que un abogado acepte la representación de un cliente, en asuntos que puedan afectar adversamente cualquier interés de otro cliente, cuando uno de estos es el Estado. Eliminar el último párrafo del Canon 21, *supra*, tiene el efecto de permitir que el Estado apruebe que sus abogados, o abogados a quienes les encomiende la representación de otra persona y les pague por ello, representen esa persona, aun cuando ella tenga intereses adversos al Estado.

Excepto por la de que "haría inoperante la Ley 9" no se ofrece justificación para tal poda ad hoc del Canon 21, *supra*. No se explica por qué, cuando es el Estado el que hace la encomienda y paga, se justifica que los abogados que representan los querellantes puedan hacer lo que no podrían si quien les encomendara la representación de los querellantes y pagara fuese meramente "otra persona o grupo".

En ausencia de esa explicación o justificación, si se ha de aplicar el Canon 21, *supra*, a la situación de autos debe hacerse sin podarlo, para así también atender las consecuencias que el propio canon exige para el conflicto planteado. El canon íntegro, por razón de su último párrafo, exige concluir adicionalmente que el abogado de los querellantes no puede percibir honorarios del Estado y representar los querellantes.

Ese resultado es particularmente importante en esta situación, si es que se concluye que existe un conflicto atentatorio contra la ética, pues, no se trataría aquí meramente de un conflicto entre intereses puramente particulares. Se trataría de un conflicto entre la norma pública que adelanta el Estado y el interés privado de los querellantes. Resultaría pues, tan o más importante en este caso, en que se encuentra en juego la norma pública del Estado, la aplicación de la asepsia ética encarnada en la disposición que se elimina, que lo que sería en el caso de intereses puramente particulares.

Nos parece un mal precedente utilizar la reglamentación vigente para concluir que existe un conflicto ético e ignorarla al determinar cuáles han de ser sus consecuencias, todo ello bajo una nueva y lacónica determinación de a quién vamos a sujetar a la misma y a quién no.

La razón indicada para podar el Canon 21 de Ética Profesional resulta altamente cuestionable. La determinación de que ciertas disposiciones de dicho Canon de Ética Profesional adoptado por este Tribunal deben ceder ante las disposiciones de un estatuto adoptado por la Asamblea Legislativa, puede debilitar y va a contrapelo con el poder inherente de este Tribunal para disciplinar abogados. *In re Freytes Mont*, 117 D.P.R. 11 (1986); *In re Díaz Alonso, Jr.*, 115 D.P.R. 755 (1984); *Colegio de Abogados de P.R.* v. *Barney*, 109 D.P.R. 845 (1980); *In re Pagán*, 71 D.P.R. 761 (1950); *In re Abella*, 67 D.P.R. 229 (1947); *In re González Blanes*, 65 D.P.R. 381 (1945); *In re Tormes*, 30 D.P.R. 267 (1922).

Nos enfrentamos, pues a un problema que exige una más adecuada ponderación por el Tribunal.

Nuestros Cánones de Ética Profesional no consideran ni reglamentan específicamente los deberes, obligaciones y conducta particulares a los abogados en funciones ejecutivas en el servicio público para situaciones como la de autos, lo que obliga en esta ocasión particular a hacer exégesis de los principios generales que informan dichos cánones. La necesidad de reglamentación adicional en esas áreas ha sido reconocida por la American Bar Association en sus *Model Rules of Professional Conduct* adoptadas por su Cámara de Delegados el 2 de agosto de 1983. En este campo la reglamentación de la American Bar Association ha jugado un papel vital en nuestra jurisdicción. ([2])

Es bajo ese canon, podado, de incierta aplicabilidad y que no reglamenta específicamente la particular situación planteada, que se amonesta y censura al señor Secretario de Justicia y se permite a los querellantes continuar gozando de una representación y beneficios económicos que el canon *específicamente* prohíbe.

*Tercero*: La limitación que se impuso el Secretario de Justicia en la Carta Circular Núm. 2006 es exclusivamente eso: una voluntad de no hacer en relación con algo sobre lo que propiamente puede actuar. Aun cuando entendemos que lo más apropiado hubiese sido que el señor Secretario de Justicia indicara por qué no se iba a sujetar a la limitación que él mismo se había impuesto, no le otorgamos mayor importancia. El hecho de que tenga un historial de más de cincuenta años nos

---

([2]) Los Cánones de Ética de la American Bar Association, entonces vigentes, fueron traducidos literalmente y aprobados por este Tribunal el 19 de julio de 1935. Los cánones vigentes, aprobados por este Tribunal el 24 de diciembre de 1970, incorporaron "aquellos conceptos y normas de los nuevos Cánones del American Bar Association que hemos creído conveniente adoptar en nuestra jurisdicción". Véanse los informes de 10 de abril de 1968 y de 1ro de junio de 1970 de la Comisión del Colegio de Abogados de Puerto Rico para Revisar los Cánones de Ética Profesional de Puerto Rico.

indica que pudo ser deseable para la época cuando el Departamento de Justicia administraba los tribunales. No quiere ello decir que históricamente la misma se haya observado estrictamente ni que debamos otorgarle jerarquía mayor que la de una autoimposición de dudosa procedencia, cuando la nuestra actualmente es una sociedad distinta a la de hace medio siglo. La sociedad moderna es litigiosa y el Estado necesita cada día más y mejor asesoramiento en relación con los asuntos que se suscitan y litigan en los tribunales. El Estado no debe estar huérfano del asesoramiento formal de su Secretario de Justicia meramente porque un asunto esté en litigio.

*Cuarto*: El iniciador o promovente de la querella, el ex Gobernador, Hon. Carlos Romero Barceló, no ha sufrido daños por razón de las actuaciones del querellado. Este querellante, a mi juicio, podía ser considerado por el Secretario de Justicia como una parte nominal en el caso Civil Núm. PE-82-970. No era irrazonable que el Secretario así lo considerara en vista de lo resuelto en *Torres* v. *Toledo*, 586 F.2d 858 (1er Cir. 1978). Los gerentes escolares no han sufrido daño irreparable atribuible a las actuaciones del querellado. Es improcedente presumir el daño ahora y actuar como si hubiese ocurrido antes de que los tribunales que tienen bajo su consideración el asunto emitan su fallo final.

Nótese que la sentencia sumaria dictada por el tribunal de instancia fue dejada sin efecto, lo cual hace académico cualquier señalamiento sobre la prontitud o lentitud de la información específica que se debió o no suministrar en cuanto a ella. Ello hace inconsecuente cualquier planteamiento relativo al Canon 19 de Ética Profesional, 4 L.P.R.A. Ap. IX.

El Departamento de Justicia, por iniciativa propia, señaló ante el tribunal de instancia y al ex Gobernador Hon. Carlos Romero Barceló la posible situación conflictiva. Lo hizo con el propósito de buscar una solución a la situación. En cuanto al tribunal, lo hizo urgentemente al percatarse de la situación mediante la presentación de la Moción de Sentencia Sumaria.

No existe evidencia de que el señor Secretario de Justicia se hubiese percatado de la situación antes de recibir dicha moción. Tampoco existe en el récord de este caso evidencia suficiente sobre la naturaleza de la participación del Secretario en el mismo. Si su intervención fue puramente formal como ejecutivo del Departamento de Justicia o si fue personal y activa, sólo puede ser objeto de conjeturas. No hay indicio alguno de que el Secretario haya actuado inmoralmente o movido por interés impropio alguno o ajeno a sus funciones legítimas.

*Quinto*: La querella en el caso se presenta con un trasfondo del que se puede tomar conocimiento judicial. El promovente de la querella, el ex Gobernador Hon. Carlos Romero Barceló, y el querellado, Hon. Héctor Rivera Cruz, son figuras públicas que participan vigorosamente en el debate político partidista del país. La creación de la posición de Gerente Escolar ha sido objeto del debate político-partidista de los últimos años. Ante tal situación este Tribunal debe ejercer la mayor cautela para no trasladar al plano judicial lo que pertenece y debe quedar en el plano del debate político.

*Sexto*: En el pasado, este Tribunal, aun cuando se ha tratado de intereses puramente particulares, no ha tomado acción disciplinaria, o ha atemperado la misma, en casos en que el querellado concernido no "[ha] tenido el beneficio del abarcador pronunciamiento judicial . . . que hoy hacemos"; "no tiene el beneficio de la ilustración previa en el asunto"; "[no] tenía el beneficio de los pronunciamientos y guías precisas prospectivas que hoy hacemos", y cuando la práctica pudo ser el resultado de "la ausencia de prohibición específica tanto en la Ley como en los Cánones". *In re Feliciano Ruiz*, 117 D.P.R. 269 (1986); *In re Protocolización de Poder*, 110 D.P.R. 652 (1981); *In re Cancio Sifre*, 106 D.P.R. 386 (1977); *In re Meléndez Pérez*, 104 D.P.R. 770 (1976).

La ausencia de perjuicio real o la satisfacción del perjuicio privado de las personas afectadas, así como la ausencia de malicia han sido factores que este Tribunal ha tomado en

cuenta, en ausencia de un interés público mayor, para atemperar o no ejercer su poder de disciplina. *In re Pagán Ayala*, 117 D.P.R. 180 (1986) ; *In re Feliciano Ruiz*, supra; *In re Coll*, 101 D.P.R. 799 (1973) ; *In re Cruz Horta*, 73 D.P.R. 227 (1952).

La complejidad y problemática de la función del Secretario de Justicia, que bien se ha expuesto en las otras opiniones emitidas, requiere que hagamos extensivas a él las normas que hemos utilizado, aun en casos menos complejos que éste, al determinar el uso que debemos hacer de nuestro poder disciplinario. No creemos que el señor Secretario de Justicia merece menos.

## II

La censura y amonestación al Secretario de Justicia de Puerto Rico, sin precedente en la historia de este Tribunal, con óptica retrospectiva en un caso complejo como éste, bajo las circunstancias señaladas en todas las opiniones y cuando el derecho y la reglamentación vigentes no consideran la situación planteada, puede tener un efecto deletéreo en el funcionamiento del Departamento de Justicia de Puerto Rico. Puede tornar en inefectiva la labor y liderazgo que se requiere del titular de ese Departamento. Independientemente de que opinemos que el juicio del señor Secretario de Justicia, al emitir la opinión de 15 de marzo de 1985 en la forma y ocasión que lo hizo, pudo ser equivocado o errado, y que su actuación en este caso no sea ejemplarizante, los hechos y la situación no requieren ni admiten el resultado a que se llega por tres jueces de este Tribunal. En el pasado, no hemos vacilado en expresar vigorosamente nuestro parecer en cuanto a la conducta del Estado. (Véase nuestro voto concurrente y disidente en *Pueblo Int'l, Inc.* v. *Srio. de Justicia,* 117 D.P.R. 230 (1986).) Pero la acción extraordinaria que se toma hoy contra dicho

funcionario, en las circunstancias descritas, por sólo tres de los siete jueces de este Tribunal, tiene proyecciones insondables en el Departamento de Justicia en esta época en que éste está empeñado en un difícil combate con los elementos criminales del país, y puede lanzar al Tribunal al vórtice del debate partidista sin justificación claramente percibible. Recuérdese que la raíz de esta controversia se encuentra en el vigoroso debate partidista que ha caracterizado a este país en los últimos años.

Ello, sin embargo, no quiere decir que la situación resultante en este caso no sea inquietante y pueda dar lugar a que se mengüe la confianza que la sociedad tiene derecho a depositar en su Departamento de Justicia. Es indeseable la contraposición del interés público y de intereses particulares que deben defenderse y la encomienda de su defensa al mismo abogado o funcionario público que debe adelantar ese interés público. Se requiere legislación clara por parte de la Asamblea Legislativa y se precisa reglamentación concordante. Es tiempo de revisar los Cánones de Ética Profesional para que éstos sean un instrumento efectivo que comprendan las complejidades que los tiempos cambiantes han introducido en la práctica de la abogacía.

Consciente ya de los problemas que la Ley Núm. 9, *supra*, y los vigentes Cánones de Ética Profesional pueden acarrear en su interacción, más por omisión que por acción, se apercibe al señor Secretario de Justicia que debe adoptar inmediatamente todas aquellas medidas cautelares adecuadas que ayuden a prevenir y evitar situaciones indeseables como la de autos. A ello limitaríamos el dictamen de este Tribunal en atención a las circunstancias de este caso.

Por todo lo anterior es que disiento.

—O—

Opinión disidente emitida por el Juez Asociado Señor Alonso Alonso.

Disiento de la opinión mayoritaria(¹) por las siguientes razones:

*En primer lugar,* los Cánones de Ética Profesional no fueron diseñados para regular una situación como la que tenemos ante nos. Ninguno de dichos cánones cubre una situación de conflicto de intereses y de deber de mantener informado al cliente, cuando la atípica relación abogado-cliente surge al amparo y en el contexto de una ley de carácter tan peculiar y propio como es la Ley Núm. 9 de 26 de noviembre de 1975, según enmendada, 3 L.P.R.A. sec. 3085.

*En segundo lugar,* la complejidad de las funciones del Departamento de Justicia y de su Secretario, *en particular* plantean realidades que no pueden perderse de vista al juzgar la conducta del Secretario.

*En tercer lugar,* examinadas las circunstancias particularísimas de este caso, y que por primera vez este Tribunal aplica una norma de conducta ética a dichas circunstancias, no me parece justo ni razonable que se le imparta efecto retroactivo a dicha norma. Al así hacerlo la opinión mayoritaria se aparta de los precedentes de este Tribunal.

*En cuarto lugar,* tan pronto el Secretario de Justicia se percata de que su interpretación y aplicación de la Ley Núm. 9, *supra,* podía plantear un problema de conducta ética, tomó a iniciativa propia las medidas correctivas correspondientes a los fines de eliminar el conflicto ético.

La Ética, como disciplina del comportamiento humano, intenta proveer una serie de normas que den dirección a la conducta del hombre en sociedad. Por sus pretensiones de impri-

---

(¹)La opinión mayoritaria está suscrita por 3 de los 7 jueces de este Tribunal.

mir rasgos de naturaleza universal y abstracta en la conducta particular del hombre, se presentan serias dificultades a la hora de juzgar la concreción bajo el prisma de la abstracción. Para contrarrestar las dificultades que ello presenta, es imprescindible analizar la conducta humana en el contexto complejo en que ésta se ejecuta, y no aisladamente. Es necesario, pues, que fijemos nuestro marco decisional de forma que podamos aplicar normas abstractas a situaciones concretas.

Este Tribunal ha sostenido en el pasado, como reconoce la opinión mayoritaria, que las fronteras y aplicaciones tajantes de algunos cánones de ética a veces resultan complicadas y que la ausencia de precedentes, en unión a hechos de su faz inocentes, dificultan en ocasiones la expresión nítida de la pauta a regir. *In re Díaz Alonso, Jr.*, 115 D.P.R. 755 (1984); *In re Carreras Rovira y Suárez Zayas*, 115 D.P.R. 778, 784 (1984), citados en la pág. 831 de la opinión mayoritaria.

Tenemos que defender los valores éticos y morales que fortalecen nuestra fibra como seres humanos civilizados, organizados social y políticamente en forma democrática. Sin embargo, considero que una defensa de tales valores no puede hacerse sin dar el debido peso a las realidades y circunstancias que los concretan.

I

Los Cánones 6, 11 y 38 de los Cánones de Ética Profesional son los únicos que regulan la conducta del abogado en su relación con el gobierno. Sin embargo, ninguno de ellos vislumbra, ni remotamente, su aplicación a los hechos del caso, especialmente cuando la relación abogado-cliente entre el ex Gobernador Hon. Carlos Romero Barceló, los Gerentes Escolares y el Departamento de Justicia y su Secretario surge a la luz de la Ley Núm. 9, *supra*.

La representación legal que ha brindado el Secretario de Justicia al ex Gobernador querellante y a los Gerentes Escolares se fundamenta en la Ley Núm. 9, *supra*, que provee para que

en determinadas circunstancias, y bajo ciertas condiciones, el Departamento de Justicia brinde representación legal a, y pague sentencias que recaigan sobre, funcionarios y ex funcionarios públicos en acciones de daños y perjuicios. Esta ley nunca ha sido interpretada por este Tribunal. No existe estatuto similar en Estados Unidos ni en otras jurisdicciones estatales. El texto de la misma, su historial legislativo, el reglamento que la instrumenta y su administración diaria son altamente complejos y oscuros.

La ley tiene efectos particulares en la relación de abogado-cliente y en los deberes que se derivan de dicha relación. No se trata de una relación de abogado-cliente común y corriente, sino de una relación especial que tiene como eje central proteger los procesos de formulación de política pública del Estado y de los servidores públicos que en ella participan. La opinión mayoritaria señala que no debe entrar a analizar la naturaleza, propósitos y alcance de dicha ley, por razón de creer que ello corresponde al tribunal de instancia. Discrepo de tal apreciación. Estamos precisamente ejerciendo nuestra jurisdicción disciplinaria sobre una relación peculiar de abogado y cliente que surge y está autorizada por dicha ley. ¿Cómo es posible que lleguemos a conclusiones de conflictos de intereses y falta al deber de información sin analizar la fuente legal de la que surge la relación de abogado y cliente en este caso? La única razón por la cual el ex Gobernador Hon. Carlos Romero Barceló, y los Gerentes Escolares son "clientes" del Departamento de Justicia y de su Secretario es por operación del mandato de dicha ley. No analizar esta ley ni la atípica relación de abogado-cliente que de ella surge es insostenible.

## II

La complejidad de las funciones del Departamento de Justicia y de las encomiendas de su Secretario plantean realidades insoslayables. El cargo de Secretario de Justicia conlleva una dualidad de funciones, ya como abogado, ya como admi-

nistrador de una estructura institucional compleja y burocrática. Como abogado en el servicio público es, además de abogado, un administrador al servicio del mejor interés colectivo; esta es su prioridad y no otra. Sostengo que la opinión mayoritaria es inconsistente en su razonamiento, pues reconoce estas complejidades administrativas, mas sin embargo no decide de conformidad a ellas. La opinión mayoritaria sostiene:

Trazado el horizonte decisorio, hemos de notar que bajo el esquema constitucional y estatutario vigente, el Departamento de Justicia, como regla general, es la institución de la Rama Ejecutiva que ostenta la representación legal del Estado Libre Asociado en las causas criminales y civiles. Como miembro con rango constitucional del gabinete del Gobernador, el Secretario de Justicia es el funcionario de mayor jerarquía del Departamento. Es nombrado por el Gobernador, con el consejo y consentimiento del Senado. *Por las funciones impuestas por ley es abogado. Sin embargo, no es un abogado más.* Sus responsabilidades legales y administrativas son numerosas y versan sobre múltiples y sensitivos asuntos. Además de las representaciones en casos criminales y civiles en los tribunales, tiene la autoridad de emitir opiniones —y publicar las que estimare de interés general— conforme el Art. 63 del Código Político, 3 L.P.R.A. sec. 71, y así influenciar la política pública. También actúa como consejero legal de otras agencias, autoridades e instrumentalidades, y es miembro de determinados organismos, por disposición de diversos estatutos. Estas responsabilidades las descarga directa y personalmente, o a través de sus auxiliares inmediatos y demás subalternos colaboradores, ubicados en el diseño de la organización administrativa. En esta estructura, se destacan las Divisiones de Litigios y la de Opiniones.

Al igual que otros departamentos ejecutivos, cada Secretario proyecta su propio estilo profesional y traza las prioridades y metas a alcanzar en la consecución de la política pública establecida, según su propio juicio y el del Primer Ejecutivo.

Tenemos también presente que algunas de las funciones adicionales del Secretario de Justicia señaladas —integrante del Gabinete, segundo en sucesión al Gobernador, y miembro

de varias juntas y organismos— pueden directa o indirectamente involucrarlo o moverlo a involucrarse, en las polémicas de asuntos públicos polarizados, impregnados o no de contenido político partidista, que trascienden la visión tradicional del papel de principal abogado-asesor gubernamental. *La línea es tenue, y por ende, a veces difícil de separar, el pronunciamiento a título clásico de Secretario de Justicia (abogado-asesor), y de aquel que irradia como miembro del Gabinete, o una Junta, o Gobernador interino.*

*A la luz de estas realidades, hemos de reconocer que de su faz, es perfectamente legítimo que un Secretario de Justicia pueda sostener una visión administrativa o criterios jurídicos distintos al de su sucesor u otro. Como corolario de esas diferencias en enfoques y de nueva política pública, pueden surgir conflictos en los distintos órdenes de la comunidad, incluso en asuntos previamente sometidos a los tribunales. "Las relaciones de los oficiales de una agencia con el abogado del gobierno no son las de cliente-abogado en su sentido ordinario, pues las identidades y deseos de estos oficiales pueden variar con la opinión popular, el voto del electorado o los caprichos de sus superiores,* mientras que la ley a la que tanto los oficiales y abogados deben lealtad permanece inalterada." (Notas al calce y citas omitidas. Énfasis suplido.) Op. Tribunal, págs. 846–848.

Si las premisas de las que parte la opinión mayoritaria son: (1) "por las funciones impuestas por ley [el Secretario de Justicia] es abogado". "Sin embargo, *no es un abogado más.* Sus responsabilidades legales y administrativas son numerosas y versan sobre múltiples y sensitivos asuntos"; (2) "es perfectamente legítimo que un Secretario de Justicia pueda sostener una visión administrativa o criterios jurídicos distintos al de sus sucesores u otro"; (3) "[l]as relaciones de los oficiales de una agencia con el abogado del gobierno no son las del cliente-abogado en su sentido ordinario", y (4) ya que el Canon 21 de Ética Profesional no se aplica en toda su extensión al Secretario de Justicia, en las págs. 846–848 de la opinión mayoritaria, respectivamente, ¿cómo es que se aplican textualmente los Cánones de Ética Profesional para

regir la conducta de la profesión privada a la conducta que en el descargo de sus múltiples funciones administrativas en pro del interés público despliega el Secretario de Justicia, todo ello sin tomar en cuenta la totalidad de las circunstancias presentes en este caso y la Ley Núm. 9, *supra*? En estricta lógica, tal aplicación es contraria a las premisas que le sirven de base. (²) Los Cánones de Ética Profesional le aplican al Secretario de Justicia y a los demás abogados del Departamento de Justicia. Sostengo, sin embargo, que la opinión mayoritaria, al aplicarlos a las circunstancias particularísimas de este caso, lo hace mecánicamente y no reconoce que éstos no fueron diseñados

---

(²) Existen estudiosos en la materia que sostienen que uno de los muchos problemas de naturaleza ética que confronta el ejercicio de la profesión legal es si las normas de comportamiento ético diseñadas para fijar la conducta del abogado privado son adecuadas para fijar la conducta del abogado que ejerce un cargo público.

El profesor L. R. Patterson ha señalado sobre el particular en *Legal Ethics: The Law of Professional Responsibility*, 2da ed., Nueva York, Ed. Matthew Bender, 1984, pág. 503, lo siguiente:

17 *"One of the many unresolved problems in the law of legal ethics is whether the rules of ethics for the private lawyer are reliable and effective guides for the public lawyer.* The assumption seems to be that they are, for the public lawyer appears to be a lawyer who represents the government in much the same way a private lawyer represents the individual client. Both employ the same skills and fulfill esentially the same roles. The public lawyer advises superiors, serves as advocate in court and acts as negotiator, a legal auditor (or investigator), and intermediator, and even as a private legislator in drafting contracts between the government and its citizens.

*"But on closer inspection, the similarities are more superficial than substantive.*

. . . . . . . .

*"The structure of the lawyer's relationship to the government, or government agency, is not so simple. First, the public lawyer serves in a dual capacity, as lawyer and as public official* or employee. Secondly, *the public lawyer does not have a client, at least not as the term is used in the law of legal ethics.*

. . . . . . . .

*"A famous judge has suggested that disinterestedness and objectivity are the chief ethical standards of government legal work.* Fahy 'Special Ethical Problems of Counsel for the Government,' 33 Fed. B.J. 331 (1978) (lecture of Judge Charles Fahy at Columbia University School of Law, April 11, 1950)."

para atender relaciones de abogado-cliente como la vislumbrada por la Ley Núm. 9, *supra*. Tenemos ante nos una especial relación abogado-cliente que se da en virtud de la Ley Núm. 9, *supra*, cuyo alcance nunca ha sido fijado.

Es obvio que no es fácil deslindar categóricamente las múltiples funciones del Secretario de Justicia. La multiplicidad de roles en una misma persona crea situaciones fronterizas que la propia opinión mayoritaria reconoce. No podemos hacer abstracción de las realidades administrativas dentro de las cuales el Secretario de Justicia desempeña sus funciones.

Los hechos expuestos ante nos ponen de manifiesto que la decisión del Departamento de Justicia tanto al emitir la opinión solicitada por la Secretaria de Instrucción Pública (en la que concluye que el cargo de Gerentes Escolares es ilegal) como al representar en los tribunales al ex Gobernador querellante y a los Gerentes Escolares bajo la Ley Núm. 9, *supra*, no fue un proceso decisional en el que intervino una sola persona, sino un sinnúmero de abogados y unidades del Departamento de Justicia en virtud de un mandato legal particular.

Para tener una idea clara de la realidad operacional del Departamento de Justicia debemos enfatizar que durante el año fiscal 1985–86 dicho Departamento emitió 351 opiniones legales de 402 presentadas y atendió 3,273 litigios civiles en su División de Litigios Generales. Su presupuesto para dicho año fue de *$26,912,214*. Existían en el Departamento 1,188 puestos cubiertos, desglosados de la siguiente forma: 75 abogados, 158 fiscales, 41 investigadores, 101 taquígrafos, 56 agentes especiales, 27 registradores de la propiedad, 69 oficiales del registro, 10 procuradores especiales para la Sala de Relaciones de Familia y 417 personas empleadas como personal administrativo y auxiliar. La Oficina del Procurador General tenía en proceso a fin de año 1,466 casos. La División de Legislación tuvo ante su consideración 1,675 consultas, y la de Asuntos del Contralor, 709 casos. A la División de Casos Contributivos se le presentaron 1,143 asuntos cuyas reclamaciones ascendían a

la cantidad de $65,133,000. La de Casos de Tierras consideró 2,215 asuntos. La División de Litigios Generales atendió 791 casos y la de Procesamiento de Deudores del Estado, 1,783. Las Fiscalías de Distrito atendieron 33,323 casos. Ello no incluye los asuntos atendidos por otras unidades a cargo de confiscaciones de vehículos y de fianzas, corrupción gubernamental, derechos civiles, delitos sexuales, criminales habituales, delitos de cuello blanco ni asuntos de menores. (Datos obtenidos del Presupuesto del Estado Libre Asociado de Puerto Rico propuesto por el Gobernador para el año fiscal 1987. Tomo I, febrero de 1986.)

Estos datos reflejan el gran volumen de asuntos que atiende el Departamento de Justicia, la diversidad y complejidad de los mismos y la gran cantidad de personas y negociados que intervienen en ellos. Dada esta complejidad organizacional y operacional administrativa, y al tomar especialmente en consideración el hecho de que el Departamento de Justicia emitió 351 opiniones, atendió 3,273 litigios civiles, y 33,323 casos criminales, no resulta lógico, razonable ni justo responsabilizar al Secretario de Justicia querellado por razones éticas cuando: (1) éste ni siquiera compareció *personalmente* ante el tribunal de instancia en el caso, ni figuró tampoco como abogado de récord; (2) en la preparación de la opinión que emite participaron varios abogados de la División de Opiniones del Departamento, y (3) la relación abogado-cliente se da en el contexto de la Ley Núm. 9, *supra*.

La opinión mayoritaria reconoce la compleja gestión de la administración pública y la existencia del fenómeno burocrático moderno. También reconoce que en virtud de tal complejidad burocrática, "[n]o puede exigírsele [al Secretario] conocimiento real o constructivo sobre todos los asuntos, casos, incidentes y escritos generados por los numerosos abogados y fiscales del Departamento". Opinión mayoritaria, pág. 865. Sin embargo, la determinación al efecto de imponerle responsabilidad ética al Secretario de Justicia por incidentes en los que

éste participa *institucionalmente*, en virtud de la Ley Núm. 9, *supra*, es cuestionable a la luz de las proposiciones de las que se parte para intentar sostenerla.

## III

Reconocimos en *In re Guzmán Géigel*, 113 D.P.R. 122 (1982), que cuando no estamos en presencia de normas de conducta claras y precisas, la imputación al efecto de que un abogado ha violado un canon de conducta profesional debe resolverse a favor del abogado que ha actuado incontrovertidamente de buena fe. En la misma línea de pensamiento hemos afirmado categóricamente que cuando no existen pronunciamientos y guías precisas sobre la conducta ética que deben observar los profesionales del derecho, su aplicación será prospectiva. *In re Feliciano Ruiz*, 117 D.P.R. 269 (1986). No encontramos ninguna razón para variar la norma y proceder a censurar y amonestar al Secretario de Justicia bajo las circunstancias particularísimas reseñadas.

Vista la totalidad de las circunstancias y la particular relación de abogado-cliente dispuesta por la Ley Núm. 9, *supra*, éste no es un caso manifiesto de violación a los Cánones de Ética Profesional. No estamos en presencia de normas de conducta ética claras y precisas. No se ha probado mala fe o negligencia de parte del Secretario de Justicia. No existen pronunciamientos y guías nuestros que regulen y controlen circunstancias de hecho tan peculiares como los que tenemos ante nos.

## IV

Tan pronto el Secretario de Justicia se percata de que su interpretación y aplicación de la Ley Núm. 9, *supra*, podía plantear un problema de conducta ética, a *iniciativa propia* trajo a la atención del tribunal de instancia y del ex Gobernador, Hon. Carlos Romero Barceló, la posible situación conflictiva. Como cuestión de hecho, es a base de su señalamiento que el tribunal de instancia deja sin efecto la sentencia suma-

ria parcial que había dictado. No existe evidencia en el récord que demuestre que el Secretario de Justicia haya actuado de mala fe, con malicia, en forma inmoral, negligentemente o movido por interés impropio o ajeno a sus funciones.

El ex Gobernador querellante no ha sufrido daños por razón de las actuaciones del Secretario de Justicia. Como cuestión de realidad, aquél podía ser legítimamente considerado por el Secretario de Justicia como una parte "nominal" dentro del contexto de la relación abogado-cliente que provee la Ley Núm. 9, *supra*. En cuanto a los Gerentes Escolares, el tribunal de instancia no ha emitido fallo final sobre la ilegalidad de la creación de sus cargos. Es por ello que, al presente, no podemos juzgar el impacto que tuvo la conducta profesional del Secretario de Justicia sobre los derechos que los Gerentes Escolares pudieran tener al amparo de las leyes vigentes.

Es norma reconocida que las opiniones legales que el Secretario de Justicia adelanta a sus compañeros de gabinete no son obligatorias para los tribunales. *Jones* v. *Williams*, 45 S.W.2d 130, 131 (1931); *Harris County Comm'rs Court* v. *Moore*, 420 U.S. 77, 87 n. 10 (1975). Esta norma está predicada en la debida separación de poderes de los respectivos poderes constitucionales. En virtud de ellas hemos sostenido que "[s]on los tribunales de justicia los llamados a resolver los casos y controversias que se presentan ante ellos. La propia Constitución dispone que '[e]l Poder Judicial de Puerto Rico se ejercerá por un Tribunal Supremo, y por aquellos otros tribunales que se establezcan por ley'. Art. V, Sec. 1". *Vélez Ruiz* v. *E.L.A.*, 111 D.P.R. 752, 756 (1981).

Si le atribuyéramos a las opiniones del Secretario de Justicia carácter mandatorio para los tribunales, se atentaría contra un principio básico y elemental que sirve de fundamento a la forma republicana de gobierno que consagra nuestra Constitución. La controversia específica que tenemos ante nos no puede tener mayor jerarquía e importancia que un pilar constitucional fundamental como lo es la función e indepen-

dencia de la Rama Judicial. Al tribunal de instancia le corresponderá hacer las determinaciones de hecho y de derecho correspondientes a base de la prueba que tenga ante sí y concederá los remedios que estime correspondientes cuando finalice el caso.

## V

En síntesis, vista la totalidad de las circunstancias, la conducta del Secretario de Justicia debe ser juzgada a la luz de: (1) una relación de abogado-cliente fundamentada en una oscura y ambigua Ley Núm. 9, *supra*; (2) la complejidad de sus funciones y las del Departamento que dirige; (3) nuestros pronunciamientos sobre aplicación de normas de conducta ético-legal, y (4) las medidas correctivas tomadas por el Secretario de Justicia al percatarse del conflicto de intereses que su interpretación y aplicación de la Ley Núm. 9, *supra*, podía causar.

Como bien ha reconocido el profesor Jaffee, "The concept of fairness relates to the attitude of judging". Jaffee, *Judicial Review*, 64 Harv. L. Rev. 1233, 1239 (1931). En nuestra función de impartir justicia, el resultado más justo debe siempre prevalecer. Lo propio es fomentar que se tomen medidas cautelares para evitar situaciones como la presente y, en caso de que sucedan nuevamente, poder corregirlas de inmediato.

Por las razones expuestas disiento respetuosamente de la posición de mis compañeros en mayoría.